864 F.2d 562
 18 Bankr.Ct.Dec. 1229, Bankr. L. Rep. P 72,637
 In the Matter of C. Ritchey SMILEY and Marie W. Smiley, Debtors.
C. Ritchey SMILEY, Defendant-Appellant,
v.
FIRST NATIONAL BANK OF BELLEVILLE, Bank of Belleville, Bank
of O'Fallon, Murphy-Wall State Bank & Trust Co., First
National Bank & Trust of Alton, Fidelity Federal Savings &
Loan Assoc., Bank of Edwardsville, First Granite City
National Bank, Bankers Trust Co. of O'Fallon, Colonial Bank
of Granite City, and State Bank of Collinsville, Plaintiffs-Appellees.
 No. 88-1065.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 25, 1988.
Decided Jan. 9, 1989.
 
 1
 Sten N. Mottaz, Thomas, Mottaz, Eastman & Sherwood, Alton, Ill., for defendant-appellant.
 
 
 2
 Myron A. Hanna, Thompson & Mitchell, Belleville, Ill., for plaintiffs-appellees.
 
 
 3
 Before WOOD, Jr., and FLAUM, Circuit Judges, and WILL, Senior District Judge.*
 
 
 4
 WILL, Senior District Judge.
 
 
 5
 Plaintiffs, creditors of defendants C. Ritchey Smiley and his wife Marie W. Smiley, filed involuntary Chapter 7 bankruptcy proceedings against the Smileys and subsequently objected to their discharge. The bankruptcy court discharged Marie Smiley but refused to discharge Mr. Smiley. The district court affirmed and Mr. Smiley appealed. We affirm.
 
 
 6
 I. Factual background.
 
 
 7
 Defendant Smiley was a businessman in O'Fallon, Illinois who owned a real estate development company, an insurance agency, a travel agency and one-half of another real estate company called Remax. As a result of the high interest rates and general decline in the real estate market in 1983 and 1984, Mr. Smiley's businesses fell on hard times. Defendant's wife, Marie Smiley, had wanted for some period of time to leave the O'Fallon area to be closer to one of her daughters in either Kansas or Texas. Because of the declining business conditions and because he wanted to escape any embarrassment to his wife and mother from his business failures, Mr. Smiley shared his wife's desire to leave.
 
 
 8
 In July of 1984, the Smileys were visiting their daughter in Kansas and looked at homes there. In September of 1984, the Smileys' search became more serious, and on November 7, 1984, the Smileys' daughter signed on their behalf a contract to purchase a house in Prairie Village, Kansas. The closing on the purchase took place on November 15. The purchase price of approximately $380,000 was financed by taking out a second mortgage on the Smileys' O'Fallon residence (which raised it from $52,000 to $210,000), by taking out a $200,000 loan from Citizens Bank & Trust of Shawnee, Kansas secured by Mr. Smiley's interest in a promissory note from Yong B. and Anne Kim ("the Kim Note") and by taking out a $36,500 loan against one of Mr. Smiley's life insurance policies.
 
 
 9
 Mr. Smiley carried out a set of transactions in preparation for the purchase of the Kansas home and for resolving his financial difficulties. On October 30, 1984, the Smileys deeded their property in O'Fallon to their daughter's corporation, Lynk, Inc., for two alleged purposes: to make it easier to finance their Kansas home and to prevent any one creditor from obtaining a preference. In early November, the title to the O'Fallon house was returned to the Smileys. Mr. Smiley, along with his attorney, Mr. Bold, met with all of his creditors on October 31, 1984 to discuss Mr. Smiley's financial problems. Mr. Smiley said that he would like to keep his home and estimated that the creditors should receive about forty cents on the dollar if they agreed to a voluntary work out.
 
 
 10
 At the next creditors' meeting on November 16, which took place after the purchase of the Kansas home, Mr. Bold presented the Smileys' plan of liquidation. Three of the assets discussed were those which made the purchase of the Kansas house possible: the life insurance, the Kim Note and the O'Fallon home. Mr. Smiley represented that the life insurance policy had a cash surrender value of between $4,000 and $7,000, although its actual cash surrender value was $36,000, and indicated that its entire value (minus enough to pay premiums for one year) was available to the creditors. He proposed to sell or borrow against the Smileys' one-third interest in the Kim Note and make one half of its proceeds available to the creditors. Finally, the creditors were informed that the Smileys wanted to keep their home, which was subject to a $52,000 mortgage (the O'Fallon residence). The creditors rejected the November 16 proposal and suggested that Mr. Smiley make a new one.
 
 
 11
 Neither Mr. Smiley nor Mr. Bold told the creditors at the November 16 meeting about the purchase of the Kansas home or about the various means of financing its purchase. When questioned at the bankruptcy hearing about the nondisclosures, Mr. Smiley stated that the purchase did not affect the Smileys' assets and that he understood that Mr. Bold would send an explanation to Mr. Lowery (the attorney for the creditors). The three assets discussed above are part of a total of $2,288,857 in assets subject to $2,614,262 in liabilities, as reflected in the bankruptcy schedules eventually filed by the Smileys.
 
 
 12
 After the November 16 meeting, the Smileys moved to the Kansas house bringing with them some of their personal property. The Smileys moved the rest of their personal property within one week. Within a few days, the creditors discovered the remortgage of the O'Fallon property and filed an involuntary bankruptcy petition on November 21.
 
 
 13
 The Smileys did not contest the petition, but filed bankruptcy schedules on February 1, 1985 claiming that the entire value of the Kansas home, as well as their personal property, car and insurance policies, were exempt pursuant to Kansas exemption law. Kans.Stat.Ann. Secs. 40-711, 60-2301, 60-2304 (1987). The bankruptcy trustee objected to the Kansas exemptions, and the bankruptcy court determined that 11 U.S.C. Sec. 522(b)(2)(A) (1982) required the Smileys to claim their exemptions based on Illinois and not Kansas law, because of the short length of their residence in Kansas. The Illinois homestead exemption is limited to $7500. Ill.Rev.Stat. ch. 110, para. 12-901 (1984). As a result, the creditors were returned to a similar position than the one they were in before the purchase of the Kansas house with regard to the Smileys' assets. The only loss they experienced because of the Smileys' attempt to obtain the Kansas exemptions was a $20,000 loss on the sale of the Kansas house purchased by the Smileys for approximately $380,000 and sold by the bankruptcy trustee for approximately $360,000.
 
 
 14
 The bankruptcy court pointed out in its decision that the denial of discharge under Section 727(a)(2)(A) requires not only proof of a transfer of non-exempt to exempt property, but also proof of actual intent to hinder, delay or defraud a creditor. The court also concluded that proof that the creditors were actually hindered, delayed or defrauded is not required. The Smileys' behavior after their creditors began to discuss repayment was not, according to the court, satisfactorily explained, and the court resolved that Mr. Smiley intended to conceal assets from the Smileys' creditors in violation of Section 727. Because of Mrs. Smiley's lack of knowledge of Mr. Smiley's business affairs, the court discharged her. On appeal, the district court affirmed the bankruptcy court's decision denying discharge of Mr. Smiley.II. Discussion.
 
 
 15
 The bankruptcy court's denial of discharge relied on 11 U.S.C. Sec. 727(a)(2)(A) (1982) which provides in part:
 
 
 16
 (a) The court shall grant the debtor a discharge, unless--
 
 
 17
 * * *
 
 
 18
 * * *
 
 
 19
 (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
 
 
 20
 (A) property of the debtor, within one year before the date of the filing of the petition; ...
 
 
 21
 There is no dispute that the conversions of assets were authorized by the debtor, Mr. Smiley, or that they were carried out within a year before the date that the involuntary petition was filed. The only two elements at issue are: (1) whether Mr. Smiley's property was "transferred, removed, destroyed, mutilated, or concealed" within the meaning of the statute and (2) whether Mr. Smiley intended "to hinder, delay, or defraud" his creditors.
 
 
 22
 Whether property of the debtor was transferred, removed, destroyed, mutilated, or concealed.
 
 
 23
 The bankruptcy court concluded, without discussion, that the Smileys had by their actions transferred, removed, destroyed, mutilated, or concealed property. (Slip op. at 9). The reference to Mr. Smiley's "intent to conceal assets ...," id. at 13, is part of the court's discussion of intent "to hinder, delay, or defraud" and therefore does not indicate how the Smileys' acts should be classified. Mr. Smiley argues that no transfer or concealment occurred, because his attempt to exchange non-exempt for exempt property failed. Brief of Appellant-Defendant at 38-43. In support of this argument, Mr. Smiley cites Liller Bldg. Co. v. Reynolds, 247 F. 90 (4th Cir.1917) and In re Adeeb, 787 F.2d 1339 (9th Cir.1986).
 
 
 24
 In Liller, the debtor attempted to shield personal assets by placing them in corporate form. The court determined that the corporate assets were not exempt but that because the assets were never beyond the reach of the creditors or outside the jurisdiction of the bankruptcy court, they were never transferred within the meaning of the bankruptcy statute. Mr. Smiley urges us to apply the Liller court's reasoning to his case and conclude that he made no transfers, since his failure to qualify for the Kansas exemptions meant that those assets were never effectively removed from the reach of the creditors or the jurisdiction of the bankruptcy court. However, we find that the narrow definition for "transfer" relied upon by the Liller court can no longer be the law since the Bankruptcy Reform Act took effect. Under that Act, "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption ..." 11 U.S.C. Sec. 101(50) (1982).
 
 
 25
 The Senate Report referring to this definitional section provides:
 
 
 26
 [a] transfer is a disposition of an interest in property. The definition of transfer is as broad as possible. Many of the potentially limiting words in current law are deleted, and the language is simplified. Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is not transfer of title, because possession, custody, and control are interests in property. A deposit in a bank account or similar account is a transfer.
 
 
 27
 S.Rep. No. 95-989, 95th Cong., 2d Sess. 26-27 (1978), reprinted in 1978 U.S.Code Cong. & Admin. News 5787, 5813; see also H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 313-14 (1977), reprinted in 1978 U.S.Code Cong. & Admin. News 5963, 6271.
 
 
 28
 The $158,000 additional mortgage on the O'Fallon residence, the pledging of the Kim Note to secure a $200,000 loan and the borrowing of an additional $36,500 on his life insurance constitute transfers under the present statutory definition, whether the Smileys were ultimately successful in getting the assets classified as exempt or not. See, e.g., Wudrick v. Clements, 451 F.2d 988 (9th Cir.1971) (refinancing of car in order to deposit the proceeds in an exempt savings account constituted a transfer); In re Compton Corp., 831 F.2d 586 (5th Cir.1987) (debtor's pledge of assets to secure a letter of credit found to be a transfer); In re Conner, 733 F.2d 1560 (11th Cir.1984) (a lien on wages constitutes a transfer). The decision about whether a person's property is exempt is separate from and subsequent to the question of whether any transfers were made. That conclusion is consistent with the holding of the Adeeb court.
 
 
 29
 In Adeeb, the debtor transferred assets for no consideration to friends and then, on the advice of a bankruptcy attorney, reversed almost all of the transfers before his creditors filed an involuntary bankruptcy petition. The court held that a debtor "may not be denied discharge of his debts if he reveals the transfers to his creditors, recovers substantially all of the property before he files his bankruptcy petition, and is otherwise qualified for a discharge." 787 F.2d at 1345 (emphasis added).
 
 
 30
 The debtor in Adeeb had made a mistake which he corrected before filing for bankruptcy so that his creditors would not be prejudiced. In the present case, Mr. Smiley made no attempt to undo all his transfers either before or after the bankruptcy petition was filed. The only asset which he retransferred before the bankruptcy petition was filed was the title to the O'Fallon residence, subject to the additional mortgage. The transfers previously discussed are sufficient for purposes of section 727. The policy behind the Adeeb decision--to "encourage[ ] debtors to reveal transfers and to attempt to recover property previously transferred," id. at 1345, is not applicable here where property was recovered only as a result of the action of the bankruptcy trustee and court.
 
 
 31
 Whether Mr. Smiley intended to hinder, delay, or defraud his creditors.
 
 
 32
 A debtor may retain as personal property assets which are exempted from the bankruptcy estate under the state or local law of the debtor's domicile. 11 U.S.C. Sec. 522(b)(2) (1982). Conversions of assets from non-exempt to exempt forms within the year preceding a petition for bankruptcy are not necessarily fraudulent to creditors. In re Reed, 700 F.2d 986, 990 (5th Cir.1983) (citing Collier on Bankruptcy, p 552.08 (15th ed. 1982)). The House and Senate Reports regarding the 1978 revision of the Bankruptcy Code provide:
 
 
 33
 As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.
 
 
 34
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 361 (1977), reprinted in 1978 U.S.Code Cong. & Admin. News 5963, 6317; S.Rep. No. 989, 95th Cong., 2d Sess. 76, reprinted in 1978 U.S.Code Cong. & Admin. News 5787, 5862. To deny discharge, a court must find proof of the debtor's actual intent to defraud, Adeeb, 787 F.2d at 1342-43, but that finding may be inferred from the circumstances of the debtor's conduct. Farmers Co-Operative Ass'n v. Strunk, 671 F.2d 391, 395 (10th Cir.1982). A bankruptcy court's finding that a debtor acted with intent to hinder, delay, or defraud is a factual determination that may be reversed only if it is clearly erroneous. Reed, 700 F.2d at 992.
 
 
 35
 Courts have come to different conclusions about what constitutes an intent to hinder, delay, or defraud under 11 U.S.C. Sec. 727(a)(2). Some courts have denied discharge upon a finding that at least part of the debtor's motivation for obtaining exempt property was to keep assets away from creditors. See, e.g., In re Schwingle, 15 B.R. 291, 294-95 (W.D.Wis.1981); In re Ford, 53 B.R. 444, 450 (W.D.Va.1984) (upholding denial of discharge because the bankruptcy court "concluded that the primary motivation for the conversion was [the debtor's] intention to remove the real estate from the creditor's reach ..."), aff'd sub nom. Ford v. Poston, 773 F.2d 52 (4th Cir.1985).
 
 
 36
 One commentator has pointed out that a debtor's desire to acquire a particular asset could theoretically be distinguished from his or her intent to shield assets, but that practically debtors have mixed motives for acquiring exempt assets (to buy a new house, for instance, and to shield assets from creditors). Resnick, Prudent Planning or Fraudulent Transfer? The Use of Nonexempt Assets to Purchase or Improve Exempt Property on the Eve of Bankruptcy, 31 Rutgers L.Rev. 615, 638 (1978). However, a rule which denies discharge where a debtor's motive is to shield assets rewards debtors for ignorance of the law and penalizes knowledgeable debtors for taking advantage of their full rights under the law. A second group of courts has relied on the policy behind bankruptcy exemptions of protecting debtors from destitution in resolving that the bankruptcy courts should set a limit on the amount of assets which debtors may shield prior to bankruptcy.[1]
 
 
 37
 A third group of courts disregards both the actual amount claimed as exempt and any evidence that the debtor is motivated by a desire to shield assets. Those courts deny discharge only where the debtor has committed some act extrinsic to the conversion which hinders, delays or defrauds. See, e.g., Grover v. Jackson, 472 F.2d 589 (9th Cir.1973);[2] In re Adlman, 541 F.2d 999 (2d Cir.1976); Love v. Menick, 341 F.2d 680 (9th Cir.1965); Forsberg v. Security State Bank of Canova, 15 F.2d 499 (8th Cir.1926); In re Johnson, 80 B.R. 953 (Bankr.D.Minn.1987). We agree with the foregoing decisions that we should not prohibit a debtor's full use of exemptions within the limits of the law.
 
 
 38
 We, therefore, find it irrelevant that Mr. Smiley stood to gain a large amount of money from his creditors had his Kansas exemptions been upheld. In addition, his knowledge of Kansas exemption law is irrelevant, since we do not find bankruptcy planning necessarily to be a fraud on creditors. We look, however, for extrinsic signs of fraud. Such signs include:
 
 
 39
 (1) that the debtor obtained credit in order to purchase exempt property; (2) that the conversion occurred after the entry of a large judgment against the debtor; (3) that the debtor had engaged in a pattern of sharp dealing prior to bankruptcy; ... and [ (4) ] that the conversion rendered the debtor insolvent.
 
 
 40
 4 Collier on Bankruptcy, p 727.02 at 19-20 (15th ed. 1986) (footnotes omitted).[3]
 
 
 41
 Although the bankruptcy court found that Mr. Smiley's course of conduct was evidence of fraud, he did not exhibit sharp dealing such as that shown by the debtor in the case of In re Reed, 700 F.2d 986 (5th Cir.1983).[4] The Reed court wrote, that "Reed's whole pattern of conduct evinces that intent [to defraud]." Id. at 991 (citing Farmers Co-Operative Ass'n v. Strunk, 671 F.2d 391, 395 (10th Cir.1982)). After obtaining an agreement from his creditors to postpone collection of his debts, Reed borrowed money to augment his antique collection. He set up a separate bank account opened without the knowledge of his creditors in which he deposited his business receipts. He repaid from that account the money he had borrowed to buy the antiques. In addition to the antiques, Reed accumulated other personal assets and then sold all of them for less than fair market value. He transferred the proceeds to exempt property by applying them towards the mortgages on his house. Reed's entire course of conduct evidenced that he intended not only to take advantage of his exemption rights, but that he intended to deceive his creditors into thinking that there would be assets available to them when, in fact, Reed was converting every one of his assets to an exempt form.
 
 
 42
 Even though Mr. Smiley's conduct is distinguishable from the pattern of sharp dealing shown by Mr. Reed, it is similar to Mr. Reed's conduct in one important respect. The unlimited homestead exemption in states such as Texas and Kansas provides an incentive for debtors such as Mr. Smiley and Mr. Reed to keep their creditors in the dark about their conversion activities. Both Mr. Smiley and Mr. Reed made efforts to hide the conversion of assets from their creditors. Mr. Smiley purchased the Kansas property without revealing the transaction to his creditors although he met with them the day after the closing. However, a finding of fraud requires more than a failure to volunteer information. Continental Bank & Trust Co. v. Winter, 153 F.2d 397 (2d Cir.1946), cert. denied, 329 U.S. 717, 67 S.Ct. 49, 91 L.Ed. 622; In re Shoesmith, 135 F. 684, 687 (7th Cir.), appeal dismissed, 198 U.S. 582, 25 S.Ct. 804, 49 L.Ed. 1172 (1905).
 
 
 43
 At the time of the November 16, 1984 meeting with his creditors, however, Mr. Smiley not only failed to volunteer information, but he misrepresented the value of his assets. He told his creditors that his assets included the full value of the O'Fallon house, the Kim Note and the life insurance policies, even though those assets had already been very substantially encumbered in order to purchase the Kansas home. In addition, Mr. Smiley told the creditors that the life insurance policy had a much lower cash surrender value than it actually had. In the Reed case, the debtor's actions and representations deceived his creditors and kept them from seeking payment. Similarly, in this case, Mr. Smiley's statements that his assets, in their unencumbered form, were available to his creditors kept them from filing an involuntary petition until they discovered by their own effort the additional mortgage on the O'Fallon property.
 
 
 44
 Since Mr. Smiley was trying to take advantage of legal exemptions, it is not clear that he intended to defraud his creditors. Nevertheless, it is at least a reasonable inference to draw from his behavior that he intended to hinder and delay them. He had every incentive to keep the creditors from filing bankruptcy until he could establish Kansas residency so that he could take advantage of the Kansas exemptions. Mr. Smiley's discharge must be denied pursuant to Section 727 because it is clear that he intended to hinder or delay his creditors, even if he had no intent to defraud them. In re Adeeb, 787 F.2d at 1343 (citing In re Trinity Baptist Church, Inc., 25 B.R. 529, 532-33 (Bankr.M.D.Fla.1982)).
 
 
 45
 When Mr. Smiley filed his statement of financial assets as required by 11 U.S.C. Sec. 521 (1982), he made a full disclosure and claimed exemptions under Kansas law. However, this disclosure did not reverse the transfers or show that Mr. Smiley meant to reverse the effect of his earlier misrepresentations. It is laudable that Mr. Smiley ultimately did not try to conceal assets on his bankruptcy schedules, but he was simply attempting to take advantage of the Kansas exemptions. The disclosure does not alter the reasonable conclusion of the bankruptcy judge that Mr. Smiley on November 16 had acted with the intent to hinder or delay discovery of his impaired assets.
 
 
 46
 Mr. Smiley's creditors were ultimately harmed by his misrepresentation at most to the extent of $20,000, but proof of harm is not a required element of a cause of action under Section 727. Adeeb, 787 F.2d at 1343. See also In re Chalik, 748 F.2d 616, 618 (11th Cir.1984); Farmers Co-Operative Ass'n v. Strunk, 671 F.2d 391, 396 (10th Cir.1982); In re Robinson, 506 F.2d 1184, 1188 (2d Cir.1974); Harris v. Baker, 86 F.2d 936, 937-38 (9th Cir.1936). All of the cited cases, except for Adeeb and Harris, are cases where the misrepresentations which led to denial of discharge were made under oath on a petition for discharge. But where there is a material misrepresentation the degree of dishonesty is not measured. Feynman v. Rosenthal, 77 F.2d 320, 322 (2d Cir.1935). In addition, a fair reading of the statute makes it clear that so long as there is an intent to hinder, delay, or defraud, in combination with an act such as a transfer, then a debtor should be denied the privilege of discharge. The statute does not provide that the creditors must have, in fact, been hindered, delayed or defrauded.
 
 
 47
 III. Conclusion.
 
 
 48
 On or before November 15, 1984, the day he closed the purchase of a new residence in Kansas, Mr. Smiley increased the mortgage on his Illinois residence by $158,000, pledged his interest in the Kim Note to secure a personal loan of $200,000 and borrowed an additional $36,500 on his life insurance. All of the foregoing proceeds were used to purchase the Kansas residence.
 
 
 49
 Under the current provisions of 11 U.S.C. Sec. 727, each of these constituted a transfer since they involved "disposing of or parting with ... an interest in property ..." That conclusion is consistent with the Congressional intent to make the definition of transfer "as broad as possible."
 
 
 50
 On November 16, 1984, Mr. Smiley and his counsel met with creditors. At no time during that meeting was there any disclosure of the additional mortgage of $158,000 on the O'Fallon, Illinois residence, the pledging of the Kim Note as collateral for the $200,000 personal note or the additional loan on the life insurance policy. Nor was it disclosed that, on the previous day, the proceeds from these transactions had been used to purchase a residence in Kansas which he believed would be exempt from his creditors' claims. On the contrary, Mr. Smiley misrepresented the value of the three assets and their availability to satisfy his creditors' claims.
 
 
 51
 The bankruptcy court found and the district court affirmed that Mr. Smiley's actions were motivated by an intent to hinder, delay, or defraud his creditors by concealing or transferring assets. That finding is clearly correct. What Mr. Smiley was obviously doing, while he sought to qualify for the Kansas exemption, was delaying his creditors from filing an involuntary petition, which they did when they discovered the second mortgage on the O'Fallon property.
 
 
 52
 Since there were both transfers and an intent to hinder, delay, or defraud his creditors, the district court's affirmance of the bankruptcy court's denial of Mr. Smiley's discharge was clearly correct under Section 727 and is affirmed.
 
 
 
 *
 The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, Eastern Division, is sitting by designation
 
 
 [1]
 In the case of In re Reed, 11 B.R. 683, 688 (Bankr.N.D.Tex.1981), the Texas bankruptcy court wrote,
 From the legislative history and from further comments in the cited paragraph in Colliers [3 Colliers on Bankruptcy p 522.08 at 40-41 (15th ed. 1987) ] it appears that the basis for that law which permits the conversion of nonexempt property to exempt property ... is that that result is necessary in order to furnish the "fresh start" and to provide the debtor with minimum exemptions.... There can be scant support for that position in Texas, however, where the homestead exemption reaches to infinity.
 Accord, Norwest Bank Nebraska, N.A. v. Tveten, 848 F.2d 871, 876 (8th Cir.1988); In re Collins, 19 B.R. 874, 877 (Bankr.M.D.Fla.1982); In re Zouhar, 10 B.R. 154, 157 (Bankr.D.N.M.1981).
 
 
 [2]
 Although the Bankruptcy Reform Act only took effect in 1979, its language is substantially the same as the statute in effect at the time these earlier cases were decided. Bankruptcy Act of 1898 Sec. 14(b)(4), 30 Stat. 544, 550 (1898). As a result, the cases decided under the former Act have continuing authority. 4 Collier on Bankruptcy p 727.02 at 14
 
 
 [3]
 Collier also includes in its list of factors that "an unusually large amount of property was claimed as exempt." p 727.02 at 20 (citing In re Zouhar, 10 B.R. 154 (Bankr.D.N.M.1981)). For the reasons already discussed, we do not find a large claim of exemptions to be evidence of fraud
 
 
 [4]
 As pointed out above at n. 1, the bankruptcy court in Reed based its denial of discharge on the amount of assets that the debtor tried to shield. The Fifth Circuit, however, did not mention the amount of the shielded assets, and based its decision on other grounds