In the MATTER OF: Jeremy WIGGAINS, Debtor

Tanya Wiggains, Appellant

v.

Diane G. Reed, Appellee

No. 15-11249

United States Court of Appeals, Fifth Circuit.

FILED February 14, 2017

———

Gerrit M. Pronske, Esq., Melanie Pearce Goolsby, Pronske Goolsby & Kathman, P.C., Dallas, TX, for Appellant.

David W. Elmquist, Esq., Reed & Elmquist, P.C., Waxahachie, TX, for Appellee.

Before JOLLY, BARKSDALE, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

The bankruptcy court held that an agreement between the debtor and his spouse that partitioned their homestead property was a fraudulent transfer. Consequently, the non-debtor spouse had no interest in the proceeds from the sale of the homestead. This court granted the parties' joint request to permit an appeal directly to this court. We AFFIRM.

## FACTUAL AND PROCEDURAL BACKGROUND

Jeremy Wiggains and his wife Tanya, married since 2007, purchased an expensive home in an exclusive Dallas suburb in late 2012. During their brief residency, the couple made valuable improvements as part of their investment strategy to increase profits from a future sale of the home.

In the summer of 2013, the Wiggainses began marketing their home. In August 2013, they signed a sales contract for $3.4 million. A few days before they received the purchase offer, two significant events occurred. First, the Wiggainses, upon the advice of counsel, executed and filed a "Partition Agreement," which sought to recharacterize their home from community property to separate property, one half belonging to each spouse. The Partition Agreement further provided that each spouse would have "sole and exclusive authority, management, and control of their separate property. . . ."

Second, Mr. Wiggains filed for bankruptcy under Chapter 7 of the Bankruptcy Code one hour after recording the Partition Agreement. He claimed an exemption for his separate interest in the home under Texas law, which is subject to the $155,675 homestead exemption cap of Section 522(p) of the Bankruptcy Code, enacted in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") to address the so-called "mansion loophole." After various objections by the Trustee and certain creditors, Mr. Wiggains agreed to limit his homestead exemption to $130,675. Mrs. Wiggains did not separately file for bankruptcy.

The family resided at the home until it was sold by the Chapter 7 Trustee for $3.4 million, netting $568,668.41 in cash proceeds after payment of all liens, claims,

and encumbrances. The net from the sale was further decreased by the disbursement of $130,675 to Mr. Wiggains pursuant to his homestead exemption.[1]

On May 5, 2014, Mrs. Wiggains initiated an adversary proceeding seeking a declaratory judgment recognizing that the Partition Agreement gave her a one-half separate property interest in the net proceeds from the sale. The Trustee counterclaimed to avoid the Partition Agreement and for a declaration that the remaining proceeds from the sale were property of the estate. The bankruptcy court held a one-day trial on these issues on October 21, 2014.

At trial, Mr. Wiggains testified that he entered into the Partition Agreement, upon the advice of counsel, with the purpose of excluding his wife's community-property interest in the homestead from his bankruptcy estate. He understood his bankruptcy exemption was statutorily capped at $155,675, an amount which he correctly believed the net sale proceeds would exceed. Although the couple discussed the possibility that both would declare bankruptcy so that they could receive the double homestead exemption of $311,350, Mr. Wiggains testified that he thought entering into the Partition Agreement was the right thing to do as he did not believe his wife was obligated on his business debts. Whether she would have been liable is not an issue raised here.

In its April 2015 decision, the bankruptcy court held that Mr. Wiggains's "sole actual intent in entering the Partition Agreement was to avoid the effect of the limitation placed on his homestead exemption by section 522(p) of the Bankruptcy Code," and the court equated such intent with "gamesmanship for the purpose of placing reachable assets outside of creditors' reach." The bankruptcy court also stated that Mr. Wiggains's "articulated intent to preserve for his family as much money as possible is the same as an intent to shield as much money as possible from creditors...."

The bankruptcy court declared the Partition Agreement avoidable as a fraudulent transfer, leaving the amount of the net sale proceeds in excess of Mr. Wiggains's exemption to be nonexempt property of the estate. The bankruptcy court also determined that Mrs. Wiggains had "no right or interest in the Homestead Net Sale Proceeds by virtue of the Partition Agreement." A principal factor in these conclusions was that the couple executed the Partition Agreement "in the shadow of an imminent bankruptcy filing" for no other reason than to shield a portion of Mr. Wiggains's assets from his creditors, which the bankruptcy court determined "can only be reasonably interpreted as an act done with intent to hinder and/or delay creditors."

In its initial decision, the bankruptcy court did not decide whether Mrs. Wiggains might be entitled to some distribution from the net sale proceeds under Section 363(j) of the Bankruptcy Code on account of her separate homestead interest, notwithstanding the avoidance of the Partition Agreement. Notably, Section 363(j) requires the Trustee, after a sale of certain types of property, to apportion and distribute sale proceeds to a debtor's spouse or co-owner. 11 U.S.C. § 363(j). On

---

1. Mr. Wiggains initially filed a motion to sell the homestead but lacked authority to do so under Section 363(b) of the Bankruptcy Code. Subsequently, the Trustee brought an expedited motion to sell the property, to which Mr. Wiggains did not object. After a hearing held on September 6, 2013, the bankruptcy court authorized the sale under the terms of the purchase contract and free and clear of any liens and encumbrances pursuant to Section 363(f)(3).

April 20, 2015, Mrs. Wiggains filed a motion in the underlying bankruptcy case to have compensation paid to her from the net sale proceeds for her separate homestead interest.

On July 1, 2015, which was after amending its initial opinion to make it an interlocutory order and also to consolidate the contested matter into the adversary proceeding, the bankruptcy court held an evidentiary hearing on Mrs. Wiggains's homestead compensation request. Mrs. Wiggains was the only witness during this second hearing. She testified that her family was renting a 6,000–square–foot house (at a cost of $5,000 per month) because they did not have funds to purchase a new homestead; that her husband was employed by a local automobile dealership; and that the family had exhausted all funds derived from the $130,675 homestead exemption. Based on an expert report, which the bankruptcy court found irrelevant, Mrs. Wiggains argued she was entitled to as much as 95% of the balance of the net sale proceeds.

The bankruptcy court concluded that Mrs. Wiggains failed to carry her burden to show entitlement to any compensation from the sale of the homestead under Section 363(j) or any other provision of the Bankruptcy Code. The bankruptcy court noted that the proffered evidence was "not particularly compelling," and did not show that the "Homestead had anything more than general intrinsic value to her." On September 4, 2015, the bankruptcy court entered its final judgment avoiding the Partition Agreement, a declaratory judgment that the Trustee was entitled to the balance of the net sale proceeds, and its judgment that Mrs. Wiggains was not entitled to a distribution from the net sale proceeds pursuant to Section 363(j).

After filing a timely notice of appeal to the district court on September 22, 2015, Mrs. Wiggains filed with this court a request, which was joined by the Trustee, to allow a direct appeal here under 28 U.S.C. § 158(d). We granted the request on December 16, 2015.

## DISCUSSION

 We review the fact findings in an order from a bankruptcy court for clear error and its conclusions of law *de novo*. *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 387 (5th Cir. 2001). "A finding of fact is clearly erroneous only if on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed." *Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 701 (5th Cir. 2003) (quotation marks omitted). "Clear error review is especially rigorous when we review a lower court's assessment of trial testimony, because the trier of fact has seen and judged the witnesses." *Moore v. CITGO Ref. & Chems. Co.*, 735 F.3d 309, 315 (5th Cir. 2013) (quotation marks omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *First Nat'l Bank LaGrange v. Martin (In re Martin)*, 963 F.2d 809, 814 (5th Cir. 1992) (quotation marks omitted).

### I. The Avoidance of the Partition Agreement

Mrs. Wiggains contends the bankruptcy court clearly erred when it found Mr. Wiggains acted with actual intent to hinder or delay his creditors by executing the Partition Agreement. Specifically, she challenges the bankruptcy court's factual finding by arguing the court (1) failed to engage in a contextual analysis to determine her husband's intent in executing the Partition Agreement, and (2) erroneously discounted her husband's legitimate intent to preserve her homestead interest.

■ We start with the language of the statute, "reading it as a whole and mindful of the linguistic choices made by Congress." *Whatley v. Resolution Trust Corp.*, 32 F.3d 905, 909 (5th Cir. 1994). Where a statute's language is "plain and unambiguous, it must be given effect." *BMC Software, Inc. v. C.I.R.*, 780 F.3d 669, 674 (5th Cir. 2015) (quotation marks omitted). By statute, a bankruptcy trustee may avoid any pre-petition transfer of assets by a debtor "that was made or incurred on or within 2 years before the date of the filing of the petition" if the debtor made the transfer "with actual intent to hinder, delay, or defraud" any past or future creditor. 11 U.S.C. § 548(a)(1)(A).

■ The phrase "intent to hinder, delay, or defraud" is not defined in the Bankruptcy Code. We find relevant meaning in the fact that the phrase is stated in the disjunctive, which signifies that an intent to hinder or to delay or to defraud is sufficient.[2] *See* 5 COLLIER ON BANKRUPTCY ¶ 548.04[1][a] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2016). Ours is not a novel interpretation. The Supreme Court repudiated common misconceptions that surround a debtor's pre-bankruptcy activities by declaring that "[a] conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them." *Shapiro v. Wilgus*, 287 U.S. 348, 354, 53 S.Ct. 142, 77 L.Ed. 355 (1932). Other courts examining a debtor's intent when deciding whether to deny discharge under Section 727(a)(2)(A) also construe "hinder, delay, or defraud" as being three separate states of mind. *See Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1200 (9th Cir. 2010) (finding it "sufficient if the debtor's intent is to hinder or delay a creditor"); *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 568 (7th Cir. 1989) (denying discharge where it "[wa]s clear that [the debtor] intended to hinder or delay his creditors, even if he had no intent to defraud them").

■ The Trustee stipulated there was no intent to defraud, so our focus turns to whether the Bankruptcy Court clearly erred in its assessment that Mr. Wiggains had actual intent to hinder or delay his creditors. We start from the reality that a transferor's actual intent is rarely susceptible to direct proof. *See In re Dennis*, 330 F.3d at 701. Given these evidentiary difficulties, courts have looked to the circumstances of the transfer to infer intent. *See id.* at 701–02. When fraud is suggested, this court has recognized six "badges of fraud" to help identify that intent—factors such as inadequate consideration, close relationship between grantor and grantee, or financial condition of the debtor before and after the transfer. *See Soza v. Hill (In re Soza)*, 542 F.3d 1060, 1067 (5th Cir. 2008). Though some of those factors are also useful in determining the intents to hinder or delay, the bankruptcy court did not try, nor found it necessary, to fit its analysis within the category of fraudulent badges. Neither will we. Without a list of factors, we seek to determine whether there is sufficient evidence of improper intent.

---

2. Mrs. Wiggains asserted at oral argument that were we to read the phrase "intent to hinder, delay, or defraud" in the disjunctive, a circuit split with the Eighth Circuit would arise. The Eighth Circuit, though, merely noted it had "been reluctant to deny a homestead exemption without a finding of intent to defraud." *Addison v. Seaver (In re Addison)*, 540 F.3d 805, 812 (8th Cir. 2008) (citing *Sholdan v. Dietz*, 108 F.3d 886, 888 (8th Cir. 1997)). In *Sholdan*, the Eighth Circuit did not conclude that an intent to hinder or delay was inadequate to render a transfer fraudulent; instead, the panel determined the facts did not support such a finding. *Sholdan*, 108 F.3d at 888. Notably, the panel stated it did "not mean to say that the test of 'hinder or delay' might not prevail under another set of facts." *Id.*

Mrs. Wiggains directs us to three bankruptcy court opinions that examined the context of a transfer to determine intent. The first two present scenarios in which the bankruptcy courts denied a debtor's discharge based on a finding that the debtor acted with actual intent to hinder or delay his creditors. *Brooke Credit Corp. v. Lobell (In re Lobell)*, 390 B.R. 206, 219–20 (Bankr. M.D. La. 2008); *Bank of Oklahoma, N.A. v. Boudrot (In re Boudrot)*, 287 B.R. 582, 587–88 (Bankr. W.D. Okla. 2002). Having no direct testimony of their respective debtor's intent to hinder or delay, the bankruptcy courts undertook a contextual analysis to reach these conclusions. *See In re Lobell*, 390 B.R. at 219 (concluding that the debtor acted with intent to hinder her creditor based on "evidence of several badges of fraud"); *In re Boudrot*, 287 B.R. at 587 (finding "substantial evidence that [the debtors] were motivated by a desire to hinder, delay or defraud" their creditors).

The third case on which Mrs. Wiggains relies more closely aligns with the facts in this case, namely, a situation in which a debtor's intent is rather clear. There, the bankruptcy court found the debtor transferred his property with the intent to hinder, delay, or defraud his creditors. *See Albuquerque Nat'l Bank v. Zouhar (In re Zouhar)*, 10 B.R. 154, 158 (Bankr. D.N.M. 1981) (transfer under a previous, but not substantively different, version of the Bankruptcy Act). Unlike the debtors in *Lobell* and *Boudrot*, the debtor in *Zouhar* "candidly admitted the purpose of" his transfer was "to shield the[ ] assets from his creditors." *Id.* at 156. He also "forthrightly admitted that he … merely utilized this method as a device to shield his assets from his creditors." *Id.* at 157. The bankruptcy court found that the debtor's "candid admission" was "supported by the sequence of events," including the debtor's

purchase of a home approximately two months before filing for bankruptcy. *Id.*

 In summary, in the first two cases the bankruptcy courts analyzed the circumstances surrounding the allegedly fraudulent transfers because of ambiguity about intent. In the third case, *Zouhar*, as well as here, there was direct evidence of a debtor's actual intent to hinder or delay. "Actual intent … may be inferred from the actions of the debtor and may be shown by circumstantial evidence." *In re Dennis*, 330 F.3d at 701–02 (alteration omitted) (quoting *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989)). We agree with another court that held: "When a debtor admits that he acted with the [necessary] intent … there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had" that intent. *See First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986).

Mrs. Wiggains argues that the bankruptcy court read an illegitimate motivation in her husband's express testimony and erroneously found that his intent was to shield assets from his creditors. In support of this argument, she refers to her husband's response to the question of whether the Partition Agreement was intended to keep their homestead out of the bankruptcy estate: "I guess that's semantics. At the time we felt like it wasn't necessarily keeping anything out. At the time we honestly felt like it was more preserving [Mrs. Wiggains's] own rights."

We agree with Mr. Wiggains's characterization; semantics and labeling are indeed involved. Keeping property in the hands of his wife is the mirror of keeping property out of the hands of creditors. It is true, as Mrs. Wiggains argues, that the property was divided to allow her to get value from the homestead. That benign purpose, though, was being pursued at the

moment before Mr. Wiggains's filing of a bankruptcy petition that would have caused the entire property to go into the bankruptcy estate for the benefit of creditors, leaving no portion, beyond Mr. Wiggains's reduced homestead exemption, to endure for the couple's benefit. If not for the creditors who could make claims on the net proceeds, there was no stated need for the partition.

We have previously recognized "the line between legitimate pre-bankruptcy planning and [impermissible intent] ... is not clear." *Swift v. Bank of San Antonio (In re Swift)*, 3 F.3d 929, 931 (5th Cir. 1993). Courts' efforts to label their analytical approach for determining whether otherwise lawful pre-bankruptcy planning exceeds the bounds of propriety provide us a colorful cast of characterizations. *See Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 245 (9th Cir.BAP 2007) ("In classical terms, it is the Sword of Damocles."); *Morgan Fiduciary, Ltd. v. Citizens & S. Int'l Bank*, 95 B.R. 232, 234 (S.D. Fla. 1988) (smell test); *Zouhar*, 10 B.R. at 157 (slaughtered-hog test). We have no metaphors to contribute, so we press on.

Mr. Wiggains's testimony alone reflects his clear intent to hinder the creditors, though couched in terms of allowing his wife to receive value from the home. The bankruptcy court in essence held that the necessary effect of this transfer was to deprive creditors. The bankruptcy court considered the evidence and made the finding that the intent to enter into the Partition Agreement in order to preserve value from a home for the non-debtor spouse was not legally independent from the intent to hinder and delay Mr. Wiggains's creditors in bankruptcy. The bankruptcy court based its findings of fact largely upon Mr. Wiggains's own testimony evincing the couple's strategic decision

to place a portion of his assets beyond the reach of creditors.

Generally, "a court can hardly expect one who fraudulently transfers property to step up and admit it under oath." 5 COLLIER ON BANKRUPTCY ¶ 548.04[1][b]. Here, the timing of the transfer, coupled with the fact the partition was one of several options admittedly considered to allow as much value as possible to be retained outside of the bankruptcy estate, are relevant extrinsic evidence of improper intent even without any admissions. From the standpoint of the creditors, which is the proper perspective, the Partition Agreement sought to reduce drastically the amount available to creditors. *See Hinsley v. Boudloche (In re Hinsley)*, 201 F.3d 638, 644 (5th Cir. 2000).

Deference to the bankruptcy court's findings is particularly appropriate on the issue of intent. Such a determination often depends on assessing a debtor's credibility. *See Perry v. Dearing (In re Perry)*, 345 F.3d 303, 309 (5th Cir. 2003). "We will not attempt to reassess the credibility of witnesses whom we have not had an opportunity to see on the stand." *Texas Mortg. Servs. Corp. v. Guadulupe Sav. & Loan Assoc. (In re Texas Mortg. Servs. Corp.)*, 761 F.2d 1068, 1078 (5th Cir. 1985). "Moreover, when the bankruptcy court's weighing of the evidence is plausible in light of the record taken as a whole, a finding of clear error is precluded, even if we would have weighed the evidence differently." *Bradley v. Ingalls (In re Bradley)*, 501 F.3d 421, 434 (5th Cir. 2007). We find no clear error in the bankruptcy court's assessment of this debtor's intent, that by placing a portion of the homestead beyond the reach of his creditors on the eve of bankruptcy, he was seeking to hinder or delay.

## II. Homestead Interest under Section 363(j) of the Bankruptcy Code

Mrs. Wiggains argues that by denying her distribution of $448,491.71 from the net sale proceeds, the bankruptcy court misapplied our caselaw that protects a non-debtor spouse's separate homestead interest. She also contends that Section 363(j) of the Bankruptcy Code is available as a mechanism for distribution of proceeds to her as a non-debtor spouse.

▮▮▮▮▮ " 'Homestead,' in both the popular and legal sense, means the 'home-place' or family home, and also property which is protected because it is the family home." *Estate of Johnson v. C.I.R.*, 718 F.2d 1303, 1307 n.12 (5th Cir. 1983). Protection for homesteads in Texas is extensive.[3] *See* TEX. CONST. art. XVI, § 50. "From the beginning of Texas' statehood in 1845, its constitutions have provided homestead protection to its residents." *England v. FDIC (In re England)*, 975 F.2d 1168, 1172 (5th Cir. 1992). The Texas constitution grants to a spouse a legal interest in the homestead that will stand firm against all claims except for "the three types of constitutionally permitted liens against homesteads," namely, those that secure purchase money, for taxes, or for home improvement debts. *Heggen v. Pemelton*, 836 S.W.2d 145, 148 (Tex. 1992).

The constitutional protection is codified in the Texas Property Code: "A homestead ... [is] exempt from seizure for the claims of creditors," subject to certain exceptions not relevant here. TEX. PROP. CODE § 41.001(a). Several other Texas statutes protect spouses across a range of circumstances involving the abandonment, sale, and conveyance of a homestead. *See Kim*

*v. Dome Entm't Ctr., Inc. (In re Kim)*, 748 F.3d 647, 653 n.11 (5th Cir. 2014).

▮▮▮▮ Despite its vigor and breadth, the protection does not grant a spouse an *economic* interest. "The homestead interest ... gives protective legal security rather than vested economic rights." *Heggen*, 836 S.W.2d at 148 (quoted in *Kim*, 748 F.3d at 661). A "spouse has only a possessory interest in the real property by virtue of its homestead character." *Kim*, 748 F.3d at 661. "Texas law has consistently distinguished *homestead* from *former homestead* and has done so for well over a century." *England*, 975 F.2d at 1173 (emphasis in original). Going one step further, we recognized that "[j]ust as the former homestead loses its homestead character when its owner abandons it, so the proceeds of the sale of that former homestead lose their homestead character and become proceeds of *former* homestead." *Id.* (emphasis in original).

With this background, we turn to the final issue: even after we accept that her husband had the intent to hinder and delay his creditors, must we recognize that Mrs. Wiggains has her own interest for which compensation is due beyond what was paid to her husband?

Much of the analytical work has already been done for us in two of our relatively recent opinions. The earlier of the two involved a non-debtor spouse who sought compensation for her separate interest in a homestead she shared with her husband. *See Kim*, 748 F.3d at 650. The couple had acquired the residence prior to BAPCPA's passage, unlike in the present case when the purchase occurred well after BAPCPA

---

**3.** "The Texas homestead laws are almost absolute in their protections against forced sale." *United States v. Rodgers*, 461 U.S. 677, 711, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983). "Texas cases have consistently held that the

fundamental purpose of the Texas homestead laws is to secure a *place of residence* against financial disaster." *England v. FDIC (In re England)*, 975 F.2d 1168, 1174 (5th Cir. 1992).

was on the scene. *See id.* at 657. We first addressed Mrs. Kim's argument that the bankruptcy court lacked the authority to order a forced sale of the property. *Id.* at 653. We held this argument foreclosed by the clear statutory language of Section 363 and Supreme Court precedent. *Id.* at 654–55.

Next we focused on whether Mrs. Kim would be entitled to compensation for her homestead interest beyond the amount her husband elected as a statutory exemption under Section 522(p). *Id.* at 656. This is in essence our question too. In seeking compensation, Mrs. Kim relied upon a hypothetical scenario in which the Supreme Court assumed, "only for the sake of illustration, that a homestead estate is the exact economic equivalent of a life estate...." *See United States v. Rodgers,* 461 U.S. 677, 698, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983) (emphasis omitted). In *Kim,* though, we commented that "it is not entirely clear that Texas courts would place exactly the same economic value on homestead rights as it would on a life estate"; we were bold to say that the hypothetical "would seem to overvalue homestead rights...." *Kim,* 748 F.3d at 661–62.

Mrs. Kim maintained that a constitutional taking would occur if she were "not compensated for the loss of her homestead rights in" the marital property. *Id.* at 657. We acknowledged that such a "constitutional argument is likely limited to cases ... in which the real property that constituted the homestead was acquired before" BAPCPA's passage. *Id.* We never reached either the constitutional issue or whether Section 363(j) was a basis for compensation because of the limited briefing. *Id.* at 663.

The other relevant decision is *Thaw v. Moser (In re Thaw),* 769 F.3d 366 (5th Cir. 2014). There, we highlighted the "important limitation" our *Kim* holding placed on a Takings Clause argument in this context, namely, that the argument is "likely limited to cases ... in which the real property that constituted the homestead was acquired before the BAPCPA was enacted." *Id.* at 369 (quoting *Kim,* 748 F.3d at 657). The homestead property in *Thaw*—as here—was purchased after BAPCPA was adopted. *Id.* at 369–70. We held this timing to be "dispositive" (no longer using the qualifier "likely"), and Mrs. Thaw was foreclosed from "press[ing] a Takings Clause claim under *Rodgers* and *In re Kim.*" *Id.* at 370.

Consequently, a Takings Clause argument relating to the Wiggains's homestead, acquired post-BAPCPA, must fail. Still, the bankruptcy court was correct in stating there may be an alternative "Takings Clause-type Constitutional argument, if the statute operates in such a way to confiscate a property interest." *Wiggains v. Reed (In re Wiggains),* 535 B.R. 700, 717 (Bankr. N.D. Tex. 2015). The bankruptcy court was relying on our *Thaw* discussion of the Supreme Court's *Rodgers* decision, which held that if a statute allowed for a "gratuitous confiscation" of property, due process concerns would arise. *Thaw,* 769 F.3d at 370 (discussing *Rodgers,* 461 U.S. at 697, 103 S.Ct. 2132).

There was no "gratuitous confiscation" in *Thaw* because the proceeds from a sale were to be apportioned between the creditors and the non-debtor spouse. *Id.* at 371 (citing 11 U.S.C. § 363(j)). An additional protection from confiscation, we held, is that Section 363(i) provides a non-debtor spouse a right of first refusal to purchase the homestead property. *Id.* (citing 11 U.S.C. § 363(i)). We determined these "safeguards" were sufficient to prevent a forced sale of the *Thaw* property from being a "gratuitous confiscation." *Id.*

Our analysis did not end there. Mrs. Thaw also argued that another Supreme

Court decision, this one involving regulatory takings, required that she be compensated. *See Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). There the Court recognized "[t]he Takings' Clause ... in certain circumstances allows a landowner to assert that a particular exercise of the State's regulatory power is so unreasonable or onerous as to compel compensation." *Id.* at 627, 121 S.Ct. 2448. The *Thaw* court determined that "*Palazzolo*'s narrow exception" did not apply to Mrs. Thaw's request for compensation as a non-debtor spouse for her separate homestead interest. *Thaw*, 769 F.3d at 371. "Just as the Bankruptcy Code protects a non-debtor from gratuitous confiscation, it makes the sale of the property not so unreasonable or onerous as to compel compensation." *Id.* (quotation marks omitted).

One final argument we did not address in *Thaw* was how Section 363 would apply to apportion any proceeds. We refused because any ruling would be an advisory opinion. *Id.* at 372 n.3. Among the reasons it would have been advisory is that there were no proceeds to apportion, as the bankruptcy court held the debtor had forfeited his homestead exemption by acting with an "intent to hinder, delay, and defraud his creditors...." *Id.* at 368.

No such forfeiture occurred here, and there are proceeds from a sale of the homestead. We therefore examine Section 363(j) to determine whether it guides distribution of net proceeds from the sale of a homestead where a non-debtor spouse claims a separate homestead interest. Section 363(j) provides:

> After a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the debtor's

spouse or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such spouse or co-owners, and of the estate.

11 U.S.C. § 363(j). We examine the two referenced subsections.

▆▆▆▆ Subsection (g) applies to "any vested or contingent right in the nature of dower or curtesy."[4] 11 U.S.C. § 363(g). Dower or curtesy rights are inchoate rights that do not vest until a spouse's death. They have no relevance here.

The only other reference in Section 363(j) is to subsection (h). It applies to "the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety...." 11 U.S.C. § 363(h). The bankruptcy court held that, under Section 541(a)(2), all interests of the debtor and his spouse in the community property became part of the estate. In that court's view, the residence was not property in which the debtor and a co-owner had an interest. Therefore, subsection (h) had no application.

In defending the ruling, the Trustee first properly denies that either *Kim* or *Thaw* ever held that Section 363(j) actually controls. The issue was not adequately raised in *Kim*, and we expressed no opinion. *Kim*, 748 F.3d at 663. It is true that in *Thaw*, we stated that Section 363 "is designed to minimize takings concerns," *Thaw*, 769 F.3d at 371, meaning that it provides for compensation at least some of the time when those concerns might otherwise arise. We also said that Section 363(j)

---

**4.** Dower "refers to the interest a widow takes in the estate of her deceased husband." *Estate of Johnson*, 718 F.2d at 1305 n.9. "Curtesy is the corresponding right of the husband...." *Id.*

would control the apportionment of proceeds from the sale of a Texas homestead between the estate and the non-debtor spouse. *Id.* In our conclusion, we held that Section 363 "governs the distribution, if any," to the non-debtor spouse. *Id.* at 372. Whatever all that meant, it is evident that in *Thaw* we never addressed the precise terms of Section 363(j) and applied them. Instead, we now interpret the discussion to be a placeholder, a recognition that Section 363(j) is where to look when considering issues such as those that are before us now.

■ The Trustee argues that Section 363(j) is actually inapplicable because neither of its predicate subsections, (g) and (h), has any relevance to Texas homestead interests. We agree with the bankruptcy court and the Trustee that subsection (g), which covers dower and curtesy, does not apply. As to subsection (h), the Trustee argues it is inapplicable when the bankruptcy estate is one of the owners of the relevant property:

Sections 363(f) and (h) only apply to sales of property of an entity *other than* the estate. Since the estate owns the interest of both the debtor *and* the non-debtor spouse, there *is no* other entity to be concerned with § 363(h). Therefore, that subsection simply does not apply with respect to the non-debtor spouse.

The failure of § 363(h) to apply its four requirements to a non-debtor spouse's interest in community property is no legislative oversight. In § 363(i), Congress allowed a "first right of refusal" to co-owners when property is sold under § 363(h), and *also allowed* such a first right of refusal to the non-debtor spouse with respect to community property that is property of the estate. If Congress had intended for the four requirements of § 363(h) to apply to community prop-

erty, it could have included "the spouse's interest in community property" in § 363(h) as it did in § 363(i).

*In re Hendrick,* 45 B.R. 976, 987–88 (M.D. La. 1985) (emphasis in original).

Agreeing with *Hendrick* as to subsection (h), the Trustee also argues that *Hendrick* is correct about Section 363(i), which, as we earlier discussed, provides a non-debtor spouse a right of first refusal to purchase homestead property. The Trustee argues that subsection is the protection for a non-debtor spouse when dealing with a couple's homestead.

This court once stated its agreement with the *Hendrick* analysis, though in a nonprecedential opinion. *See Solomon v. Milbank (In re Solomon),* 129 F.3d 608, 1997 WL 680934, at *3 (5th Cir. 1997) (unpublished). Though *Solomon* is not controlling, we can adopt its analysis on this point. We do. Despite Mrs. Wiggains's argument, *Solomon* is consistent with *Thaw* and *Kim* inasmuch as nothing in those two precedents require reading Section 363(j) to apply to a sale of a homestead held in Texas as community property. Section 363(j), of course, and its reference to subsection (h), apply nationwide. The difficulty of applying those parts of Section 363 to a Texas homestead in no way affects its general utility.

■ Having eliminated these possibilities, the bankruptcy court then considered whether there was "something special and unique about a non-debtor spouse's homestead interest" to make limiting the award to the value of the debtor spouse's Section 552(p) cap (here, the $155,675, reduced to $130,675) either confiscatory or onerous. *In re Wiggains,* 535 B.R. at 720. The bankruptcy court said that "certain, special circumstances" may entitle a non-debtor spouse to "just compensation" from a forced sale of their homestead. *Id.*

As previously stated, there is no doubt that a homestead interest "gives protective legal security rather than vested economic rights." *Kim*, 748 F.3d at 659 (quoting *Heggen*, 836 S.W.2d at 148). To explain the nature of this protection, we borrow from a common idiom of property law that describes property as a "bundle of sticks." Rather than being another stick in the bundle, a party's homestead interest "is a protective safe in which the bundle is put." *Venn v. Reinhard (In re Reinhard)*, 377 B.R. 315, 319 (Bankr. N.D. Fla. 2007). If the safe is empty, as is the case here and in other community-property states where the entire homestead property is brought in as a part of the bankruptcy estate, it can hardly be argued that an otherwise voluntary sale of a homestead entitles a non-debtor spouse to compensation for the contents of her empty safe.

We agree with the bankruptcy court that this case does not present the type of exceptional circumstance that may entitle a non-debtor spouse to compensation beyond the statutory cap of their spouse's homestead exemption. Well before Mr. Wiggains filed his bankruptcy petition, the couple actively sought to sell the home so they could reap the equity they gained in their brief nine months of ownership of the luxury investment property. The Wiggainses actively participated in the sales process, even when the Trustee had the sole authority to sell the homestead, and they did not object when the Sale Order was entered. There is nothing confiscatory about that process.

*Palazzolo* also cannot provide Mrs. Wiggains the relief she now seeks. She offers very little argument that the sale of her interest in the property is "so unreasonable or onerous as to compel compensation" under the Takings Clause. *See Palazzolo*, 533 U.S. at 627, 121 S.Ct. 2448. The short amount of time that Mrs. Wiggains

and her family resided in their Texas homestead, an investment property, combined with the family's posh lifestyle and ongoing exorbitant living expenses, does not present the appropriate factual basis that would otherwise entitle her to compensation. In any event, we noted in *Thaw* that the foundation of this Takings Clause argument likely crumbles for a home purchased post-BAPCPA where the party seeking compensation "was on constructive notice of how the Bankruptcy Code would operate in the event of [the debtor's] bankruptcy." *Thaw*, 769 F.3d at 371–72. Such is the case here.

▉▉▉▉ Our ruling in no way denigrates the importance of a Texas homestead interest. It is constitutionally protected; it provides "a secure asylum of which the family cannot be deprived by creditors." *England*, 975 F.2d at 1174 (quoting *Herman Iken & Co. v. Olenick*, 42 Tex. 195, 198 (1874)). On the other hand, "the intent and purpose of the BAPCPA was to limit the dollar amount of homestead exemptions." *Kim*, 748 F.3d at 658. If there is a clash of policies here, the Supremacy Clause controls. *See Rodgers*, 461 U.S. at 701, 103 S.Ct. 2132. "Once state-law property interests are defined, federal law controls the consequences." *United States v. Elashi*, 789 F.3d 547, 552 (5th Cir. 2015).

When it became clear that Mr. Wiggains would file bankruptcy to satisfy his outstanding debts, the couple entertained various options and made their best estimate on ultimate financial benefits by having only Mr. Wiggains file after the Partition Agreement was recorded. Allowing Mrs. Wiggains to sidestep the statutory limits for homestead exemptions and obtain approximately $500,000 in proceeds that otherwise are for creditors would lay waste to

the provisions of the Bankruptcy Code involved here.

AFFIRMED.