FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE TENDERLOIN HEALTH, FKA Continuum HIV Day Services, AKA Tenderloin Health Incorporated, *Debtor*, | No. 14-17090 D.C. No. 4:13-cv-03992-JSW |
| E. LYNN SCHOENMANN, Trustee, *Plaintiff-Appellant*, v. BANK OF THE WEST, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted October 18, 2016
San Francisco, California

Filed March 7, 2017

Before:  A. WALLACE TASHIMA and MILAN D.
SMITH, JR., Circuit Judges, and EDWARD R.
KORMAN,[*] District Judge.

Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Korman

---

## SUMMARY[**]

### Bankruptcy

The panel reversed the district court's order affirming the bankruptcy court's summary judgment in favor of the defendant in an adversary proceeding brought by a chapter 7 bankruptcy trustee.

The trustee sought to recover for the bankruptcy estate a $190,595.50 loan payment debtor Tenderloin Health made to defendant Bank of the West within ninety days of the filing of the bankruptcy petition.  The bankruptcy court concluded that the trustee failed to satisfy the "greater amount test," pursuant to 11 U.S.C. § 547(b)(5), by demonstrating that by virtue of that payment, the Bank received more than it otherwise would have in a hypothetical chapter 7 liquidation where the challenged transfer had not been made.  The bankruptcy court reasoned that the Bank

---

[*] The Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

had a right of setoff, and the debtor's account contained at least $190,595.50 on the petition date.

The trustee asserted that in the hypothetical liquidation, the trustee would avoid a $526,402.05 deposit, leaving less than $190,595.50 in the debtor's account, even allowing for the Bank's right of setoff.

The panel held that courts may account for hypothetical preference actions within a hypothetical chapter 7 liquidation when such an inquiry is factually warranted, is supported by appropriate evidence, and the action would not contravene an independent statutory provision. The panel concluded that the $526,402.05 deposit would constitute an avoidable preference in the hypothetical liquidation at issue. The panel therefore reversed the district court's judgment in favor of the Bank and directed that the action be remanded to the bankruptcy court further proceedings.

District Judge Korman concurred in part and concurred in the judgment. He concurred in the decision to reverse and remand to the bankruptcy court and joined all but Part II of the majority opinion, addressing the hypothetical liquidation. Judge Korman agreed that, under the circumstances of this case, applying § 547(b)(5)'s "greater amount" test required the court to construct a hypothetical liquidation, and that in so doing, the court could consider whether a reasonable trustee would bring and win a preference action within the hypothetical chapter 7 proceedings. He wrote that he could not, however, join in the liquidation constructed by the majority because he could not agree that the entirety of the $526,402.05 deposit was itself a preferential transfer subject to clawback under 11 U.S.C. § 547.

**COUNSEL**

Dennis Davis (argued), Goldberg Stinnett Davis & Linchey, Petaluma, California, for Plaintiff-Appellant.

James A. Tiemstra (argued) and Lisa Lenherr, Tiemstra Law Group PC, Oakland, California, for Defendant-Appellee.

**OPINION**

M. SMITH, Circuit Judge:

In this preference action, plaintiff-appellant E. Lynn Schoenmann (Schoenmann), the trustee in bankruptcy, seeks to recover for the bankruptcy estate a $190,595.50 loan payment debtor Tenderloin Health (Tenderloin) made to defendant-appellee Bank of the West (BOTW) within ninety days of the filing of Tenderloin's chapter 7 bankruptcy. To succeed, Schoenmann must demonstrate that by virtue of that payment BOTW received more than it otherwise would have in a hypothetical chapter 7 liquidation where the challenged transfer had not been made. This inquiry, required by 11 U.S.C. § 547(b)(5), is called the "greater amount test."

The bankruptcy court granted BOTW's motion for summary judgment, finding Schoenmann could not satisfy section 547(b)(5), because BOTW had a right of setoff, and Tenderloin's account contained at least $190,595.50 on the petition date. Schoenmann asserts that in the hypothetical liquidation, the trustee would avoid a $526,402.05 deposit, leaving less than $190,595.50 in Tenderloin's account, even allowing for BOTW's right of setoff.

In order to resolve the issues presented in this case, we address whether courts may entertain hypothetical preference actions within section 547(b)(5)'s hypothetical chapter 7 liquidation, and if so, whether the $526,402.05 deposited in this case would meet the definition of an avoidable preference.

We conclude that courts may account for hypothetical preference actions within a hypothetical chapter 7 liquidation when such an inquiry is factually warranted, is supported by appropriate evidence, and the action would not contravene an independent statutory provision. We are also satisfied that the $526,402.05 deposit in this case would constitute an avoidable preference in the hypothetical liquidation at issue here.

We therefore reverse the district court's judgment in favor of BOTW and direct that this action be remanded to the bankruptcy court for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2009, BOTW extended a $200,000 line of credit to Tenderloin, a walk-in clinic serving AIDS patients in San Francisco. BOTW loaned another $100,000 to Tenderloin two years later. The loans were secured by Tenderloin's personal property, including its deposit accounts with BOTW.

In late 2011 or early 2012, Tenderloin elected to wind up its affairs. In carrying out that election, it sold its only real property for $1,295,000. The escrow on that sale closed on June 13, 2012. Tenderloin used the proceeds of that sale to execute two transactions that same day. First, it paid BOTW $190,595.50 from escrow to satisfy fully its outstanding loan obligations (debt payment). Next, it moved the rest of its net

sale proceeds—$526,402.05—from escrow into its BOTW deposit account (the deposit).

On July 20, 2012, Tenderloin filed for chapter 7 bankruptcy. Ninety days prior to filing, its account contained approximately $173,015.00.[1] That sum shrunk to $52,735.11 on the date of the two disputed transfers, but grew to $576,603.03 immediately after the deposit. Tenderloin then spent some of its funds in the days preceding its bankruptcy, so the account contained $564,115.92 on the petition date. If we subtract from that sum the amount of the disputed deposit—$526,402.05—Tenderloin's account would have contained only $37,713.87 on the petition date.

Schoenmann sued BOTW on December 12, 2012, alleging that the debt payment was preferential, and subject to avoidance under 11 U.S.C. § 547(b). The bankruptcy court granted BOTW's motion for summary judgment on July 31, 2013, concluding that Schoenmann could not show that BOTW received more than it would have in a hypothetical liquidation where the debt payment had not been made. Schoenmann appealed to the district court pursuant to 28 U.S.C. § 158(a)(1). The district court affirmed, and Schoenmann timely appealed to our court.

**JURISDICTION AND STANDARD OF REVIEW**

We have jurisdiction pursuant to 28 U.S.C. § 158(d)(1). "We review de novo the district court's judgment in the appeal from the bankruptcy court, and apply the same de novo standard of review the district court used to review the

---

[1] There appears to be a factual dispute concerning the amount in Tenderloin's deposit accounts on the date ninety days preceding the filing of its bankruptcy. We need not resolve this dispute because the difference in the amounts is not material to the outcome.

bankruptcy court's summary judgment." *Suncrest Healthcare Ctr. LLC v. Omega Healthcare Inv'rs (In re Raintree Healthcare Corp.)*, 431 F.3d 685, 687 (9th Cir. 2005).

## ANALYSIS

Section 547(b) permits a bankruptcy trustee to recover for the benefit of the bankruptcy estate preferential payments from a debtor to a creditor made within the ninety days preceding the filing of a bankruptcy. 11 U.S.C. § 547(b). To "avoid" such a payment, the trustee must show, among other things:

> (5) that [it] enables such creditor to receive *more than* such creditor would receive if—
>
> > (A) the case were a case under chapter 7 of this title;
> >
> > (B) the transfer had not been made; and
> >
> > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b)(5) (emphasis added).

This element—11 U.S.C. § 547(b)(5)—constitutes the so-called "greater amount test," which "requires the court to construct a hypothetical chapter 7 case and determine what the creditor would have received if the case had proceeded

under chapter 7" without the alleged preferential transfer.[2] *Alvarado v. Walsh (In re LCO Enters.)*, 12 F.3d 938, 941 (9th Cir. 1993) (*LCO*).    Schoenmann challenges the $190,595.50 debt payment, claiming that section 547(b)(5) is satisfied in this case if BOTW "received a greater amount than it would have if the [debt payment] had not been made and there had been a hypothetical chapter 7 liquidation as of the petition date." *Batlan v. TransAmerica Commercial Fin. Corp. (In re Smith's Home Furnishings, Inc.)*, 265 F.3d 959, 963 (9th Cir. 2001) (*Smith*).

The bankruptcy court determined that BOTW did not receive more than it would have in a hypothetical liquidation because it maintained a right of setoff that entitled it to full payment, and Tenderloin's deposit account held the requisite amount of funds on the petition date.  Schoenmann argues, however, that the trustee would avoid the $526,402.05 deposit in a hypothetical liquidation, such that the deposit account would contain only $37,713.87 on the petition date,

---

[2] It may at first blush seem incongruous to ask what the creditor would have received if "the case were a case under chapter 7," given that this matter *is* in fact a chapter 7 liquidation.  The reference to chapter 7, however, defines the character of the *hypothetical* bankruptcy, which is then used as a point of comparison to see if the pre-petition payments rendered the preferred creditor better off.    We have previously recognized that a preference action is permissible under section 547(b), even when filed in conjunction with a chapter 7 liquidation.  *See, e.g.*, *USAA Fed. Savings Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 885–88 (9th Cir. 2010) (affirming decision concerning a preference action brought in the course of a chapter 7 liquidation); *Busseto Foods, Inc. v. Charles Laizure (In re Laizure)*, 548 F.3d 693, 695 (9th Cir. 2008) (chapter 7 trustee brought preference action); *Wood v. Stratos Prod. Dev., LLC (In re Ahaza Sys., Inc.)*, 482 F.3d 1118, 1122 (9th Cir. 2007) (same).

a sum far less than the $190,595.50 BOTW actually received, even allowing for its right of setoff.

BOTW objects to Schoenmann's analysis for two reasons. First, BOTW insists it is impermissible to entertain a hypothetical preference action within a hypothetical liquidation. Second, BOTW claims that the deposit made by Tenderloin into its deposit account would not meet the definition of an avoidable preference. We find neither argument persuasive.

## I. Section 547(b)(5) Does Not Forbid Courts from Considering Hypothetical Preference Actions.

The text of the Bankruptcy Code, its legislative history, and current practice in the bankruptcy courts all support the conclusion that courts may entertain hypothetical preference actions within hypothetical chapter 7 liquidations. Further, our holding in *LCO* does not pose an obstacle to this conclusion.

### A. Text and Legislative History

Statutory interpretation begins with the text. *Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975, 980 (9th Cir. 2016). "If the meaning of the text is unambiguous, the statute must be enforced according to its terms." *Id.*

Here, section 547(b)(5) permits the trustee to avoid any transfer within ninety days of bankruptcy that enables the creditor "to receive more than such creditor would receive if—(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt *to the extent provided by the provisions of this title*." 11 U.S.C. § 547(b)(5) (emphasis added). The phrase "provisions of this title" appears to refer

to the totality of Title 11 of the Code, which includes the preference provisions appearing in section 547. Accordingly, the text clearly does not directly forbid courts from considering hypothetical preference actions within a hypothetical chapter 7 liquidation. However, since the statute treats the issue globally, our understanding will be refined by considering the legislative history of section 547(b)(5).

Section 547 was included in the Bankruptcy Reform Act of 1978.**[3]** Pub. L. No. 95-598, 92 Stat. 2549 (1978). Describing element 547(b)(5), the Senate Committee Report states "the transfer must enable the creditor . . . to receive a greater percentage of his claim than he would receive under the *distributive provisions* of the bankruptcy code." S. Rep. No. 95-989, at 87 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5873 (emphasis added). The phrase "distributive provisions" might be thought to narrow the hypothetical liquidation to disbursement under chapter 7, but the very next sentence clarifies the meaning of the phrase: "Specifically, the creditor must receive more than he would if the case were a liquidation case, if the transfer had not been made, and if the creditor received payment of the debt *to the extent provided by the provisions of the code*." *Id.* (emphasis added). The House Report echoes this language: "A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate." H.R. Rep. No. 95-595, at 177

---

**[3]** The preference provisions first appeared as sections 60a and 60b of the Bankruptcy Act of 1898. *See* The Bankruptcy Act of 1898 § 60, Ch. 541, 30 Stat. 544, 562 (1898). The Bankruptcy Reform Act of 1978 superseded those provisions but retained the same basic elements.

(1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6138.  The phrase "participate[s] in the distribution" leaves room to assume the hypothetical chapter 7 trustee might initiate preference actions in conjunction with the "distribution" of the assets of the estate.

Evidence bearing more directly on this question appears in the paragraphs that follow the general overview of section 547(b)(5).  The reports provide

> The phrasing of the final element changes the application of the greater percentage test from that employed under current law. Under this language, the court must focus on the relative distribution between classes as well as the amount that will be received by the members of the class of which the preferee is a member.  *The language also requires the court to focus on the allowability of the claim for which the preference was made.*  If the claim would have been entirely disallowed, for example, then the test of paragraph (5) will be met, because the creditor would have received nothing under the distributive provisions of the bankruptcy code.

H.R. Rep. No. 95-595 at 372 (emphasis added); *accord* S. Rep. No. 95-989 at 87.  By invoking "allowability," which refers generally to whether payment of a claim would violate some independent provision of the Bankruptcy Code, the report suggests it is appropriate to consider whether a hypothetical claim would be affected by the preference provisions.  There are numerous cases that refer to the greater amount test as implicating the "distributive

provisions" of the Code,[4] but in light of this history, we cannot exclude section 547 from the hypothetical chapter 7 "distribution."

## B.  Current Practice Under the Bankruptcy Code

The view that courts may consider hypothetical preference actions within hypothetical chapter 7 liquidations is bolstered by the fact that bankruptcy courts are doing precisely that under two other provisions of the code.

Section 1129(a)(7)(A)(ii) requires bankruptcy courts to determine what creditors would receive under a hypothetical chapter 7 liquidation, and then compare that amount to what the same creditors would receive under a chapter 11 reorganization.  It provides that a bankruptcy court may confirm a chapter 11 plan only if each holder of an impaired claim "will receive or retain . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." 11 U.S.C. § 1129(a)(7)(A)(ii).  Although "[t]he hypothetical liquidation analysis must be based on evidence and not assumptions in order to meet the best interests of creditors test," Collier on Bankruptcy ¶ 1129.02 n.98 (Alan N.

---

[4] *See, e.g.*, *Guttman v. Constr. Program Grp. (In re Railworks Corp.)*, 760 F.3d 398, 402 (4th Cir. 2014) (stating that under section 547(b)(5), a transfer "must enable the creditor to receive a greater percentage of its claim than it would under the normal distributive provisions in a liquidation case under the Bankruptcy Code"); *Kimmelman v. Port Auth. of N.Y. & N.J. (In re Kiwi Int'l Air Lines, Inc.)*, 344 F.3d 311, 321 (3rd Cir. 2003) (observing a "trustee could not satisfy § 547(b)(5) because the pre-petition payments did not improve the creditor's position under the distributive provisions of the Bankruptcy Code").

Resnick & Henry J. Sommer eds., 16th ed. 2016) [hereinafter "Collier"] (citing *In re Mcorp Fin., Inc.*, 137 B.R. 219, 228–29 (Bankr. S.D. Tex. 1992)), "a trustee's avoiding powers in a hypothetical chapter 7 case may [] affect the analysis," *id.* ¶ 1129.02.

For instance, in *In re Affiliated Foods, Inc.*, 249 B.R. 770 (Bankr. W.D. Mo. 2000), the court found the statute "requires an estimation of the value of all of the bankruptcy estate's assets, including such hard to determine values as disputed and contingent claims, the potential disallowance of claims (under § 502(d)), the probability of success and value of causes of action held by the estate, and, in this case, potential preference actions." *Id.* at 788 (internal citation omitted). Likewise, in *In re Sierra-Cal*, 210 B.R. 168 (Bankr. E.D. Cal. 1997), the court found "all provisions applicable in a chapter 7 liquidation are to be taken into account when the court determines what sums would be paid to whom in a hypothetical liquidation." *Id.* at 174. It then applied two avoidance provisions in the hypothetical liquidation using the facts and testimony in the record. *See id.* at 174–75 (concluding "a competent chapter 7 trustee would be able to recover against [the creditor] under § 544 and § 549").

Chapter 13 has a comparable "best interest of the creditors" test that requires the same comparison. Section 1325(a)(4) requires a bankruptcy court to confirm a chapter 13 plan if, among other things, "the value, as of the effective date of the plan, of property to be distributed under the plan . . . is not less than the amount that would be paid on such claim *if the estate of the debtor were liquidated under chapter 7 of this title on such date*." When administering this provision, "court[s] must consider property that would be likely to be recovered by a chapter 7 trustee's use of the

avoiding powers."  Collier ¶ 1325.05; *see also In re Larson*, 245 B.R. 609, 614 (Bankr. D. Minn. 2000) (finding that in the hypothetical liquidation, the court "must look not only at the Debtor's assets as listed on his schedules, but [it] must also consider the recovery of assets by the trustee through fraudulent transfer and preference actions").

Lastly, we note that several courts have applied hypothetical setoff analyses under section 553 within hypothetical chapter 7 liquidations.  *See Durham v. SMI Indus. Corp.*, 882 F.2d 881, 884 (4th Cir. 1989) ("SMI would have been entitled to assert its right of setoff under section 553(a) post-petition if the check exchange had not been executed before Continental's petition was filed since both debts were incurred pre-petition."); *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1040 n.11 (5th Cir. 1987) ("The fact that a setoff never actually took place does not affect the analysis.    The issue is whether Exxon hypothetically had the *right* to a setoff, and because of this right it was secured and therefore the payment received from Braniff was not a voidable preference."); *Mason & Dixon Lines, Inc. v. St. Johnsbury Trucking Co. (In re Mason & Dixon Lines, Inc.)*, 65 B.R. 973, 976 (Bankr. M.D.N.C. 1986) ("In the case at bar, had the debtor not made the payment to the creditor carrier, the creditor could have offset the debt prepetition pursuant to section 553 or if the 30 days elapsed postpetition had the offset amount as a secured claim under section 506(a)."); *Lingley v. Contractors Grp., Inc. (In re NEPSCO, Inc.)*, 55 B.R. 574, 576 (Bankr. D. Maine 1985) ("Had the debtor in this case not paid CGI the $6,221.56 prior to the filing of the Chapter 7 petition, CGI would have been entitled to a right of setoff under 11 U.S.C. § 553(a)."). True, hypothetical setoff analyses, unlike preference actions, do not require that we assume a party will initiate an adversary proceeding.  That said, it would be odd to permit

bankruptcy courts conducting hypothetical liquidations to look only to section 553, while ignoring other chapter 5 provisions, like section 547.

### C.  Our Prior Holding in *LCO* poses no bar.

In response, BOTW relies on our decision in *LCO*, which held "the hypothetical chapter 7 analysis required by § 547(b)(5) must be based on the actual facts of the case." 12 F.3d at 940.  Since Schoenmann has not challenged the deposit in Tenderloin's actual liquidation, BOTW asserts we may not permit such a challenge in a hypothetical liquidation.  A close reading of *LCO* reveals that this argument is misguided because it improperly relies on the decision's broad language divorced from the context of the case.

In *LCO*, the debtor, LCO Enterprises, leased commercial space from a company named Lincoln.  *Id.*  LCO fell behind in paying rent and filed for chapter 11 bankruptcy, leading LCO and Lincoln to restructure their relationship.  *Id.* Specifically, they changed the terms of the lease agreement, and LCO disclosed the terms of the revised agreement in its chapter 11 plan.  *Id.*  LCO then faced the decision of whether it would assume or reject the lease in bankruptcy.  *Id.* Importantly, under chapter 11, the debtor-in-possession (LCO) stands in the shoes of the trustee.  11 U.S.C. § 1107. Additionally, if the debtor was in default on an unexpired lease before filing for bankruptcy, the lease may not be assumed "unless, at the time of assumption," the trustee cures the default and provides adequate assurance of future performance.  11 U.S.C. § 365(b)(1)(A)–(C).  LCO, as trustee, assumed the revised lease and cured the default, in compliance with section 365(b).  *LCO*, 12 F.3d at 942.  The reorganization plan was eventually confirmed by the bankruptcy court.  *Id.* at 940.

Two months after confirmation, a chapter 11 trustee was appointed to pursue any preferential payments. *Id.* The trustee sued to recover several rent payments LCO transmitted to Lincoln in the ninety days preceding the filing of its bankruptcy. *Id.* The action turned on the "greater amount test"; i.e., whether Lincoln received more than it otherwise would have in a hypothetical chapter 7 liquidation as of the petition date where the prepetition rent payment had not been made. *Id.* at 941.

The trustee argued that in a hypothetical liquidation, "a hypothetical chapter 7 trustee might have rejected the lease," giving Lincoln an unsecured claim for its shortfall in rent, rather than the full payment it received when the lease was assumed and the default was cured. *Id.* at 942. The trustee also said the court "should exercise its own independent judgment as to whether, if the court were administering the estate under chapter 7, it would have assumed or rejected the lease" at the time of the chapter 11 bankruptcy. *Id.* We rejected these arguments, holding "[t]he phrase 'hypothetical chapter 7' . . . does not mean that the bankruptcy court can construct its own hypothetical from whole cloth or from only some of the facts." *Id.* at 944. Rather, "the hypothetical chapter 7 analysis required by § 547(b)(5) must be based on the actual facts of the case." *Id.* at 940. Since the lease had been assumed, "the [bankruptcy] court could neither speculate that there was no lease nor assume that the lease was rejected." *Id.* at 944. Those assumptions simply did not "reflect[] the facts at any time." *Id.* Moreover, under section 365(b), once the lease was assumed, the requirement to cure any default was mandated. This gave Lincoln a secured claim for all outstanding prepetition rent in the hypothetical liquidation,

so it did not receive more than it otherwise would, precluding satisfaction of the greater amount test.[5]

Importantly, we also noted that if we deviated from the actual facts in the case, and assumed that the hypothetical chapter 7 trustee had rejected the lease, the trustee would be allowed to recover payments it was obligated to make to Lincoln to cure the default pursuant to section 365(b). *Id.* at 943. In other words, straying from the actual facts would permit "§ 547(b) to circumvent the requirements of § 365(b)." *Id.* To avoid such a statutory collision, we held "[t]he [t]rustee cannot have his leased property and his rent payments, too." *Id.* at 943–44.

Mindful of this context, it is apparent that *LCO* required fidelity to the actual facts in the case because to hold otherwise under those circumstances would have violated an independent statutory provision of the Bankruptcy Code. Section 365(b) requires the trustee to pay the landlord all outstanding rent when a lease is assumed, but a preference action would permit the trustee to recover the very prepetition rent payments it owes the landlord under that provision. In light of this conflict, we conclude that *LCO* must be narrowly construed. To that end, courts that have followed *LCO*'s holding have done so when presented with the same statutory collision scenario. *See In re Kiwi Int'l Air Lines, Inc.*, 344 F.3d at 314 ("[T]he assumption of a contract under 11 U.S.C. § 365 bars a preference claim by a trustee."); *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1174 (7th Cir. 1996) ("Section 547 and § 365 are mutually exclusive avenues for a trustee. A trustee may not prevail

---

[5] "If a creditor is fully secured, a prepetition transfer to him is not preferential because the secured creditor is entitled to 100% of his claim." *LCO*, 12 F.3d at 941.

under both.  Nor may a subsequent trustee pursue one course, when her predecessor has pursued another.").

Adding further support for the interpretation that *LCO* requires fidelity to the actual facts only when doing otherwise would violate an independent statutory provision, the opinion explicitly relies on the Eleventh Circuit's decision in *Seidle v. GATX Leasing Corporation*, 778 F.2d 659 (11th Cir. 1985).  *See LCO*, 12 F.3d at 943.  There, a creditor held a chattel mortgage on a debtor's aircraft which secured payments due under a note.  *Seidle*, 778 F.2d at 660.  The debtor made partial payments on the note within the ninety day period preceding its chapter 11 bankruptcy.  *Id.* Once in bankruptcy, the debtor and creditor entered into a court-approved stipulation under 11 U.S.C. § 1110, obligating the debtor to cure its default in exchange for the debtor's continued use of the aircraft.  *Id.* at 661.  The trustee later sued to recover as preferential the prepetition payments made on the note.  *Id.*  The court rejected the preference action because the trustee was seeking to recover payments it was obligated to make under the court-approved stipulation.  *See id.* at 665 ("Pursuant to the section 1110 stipulation, a creditor is entitled to unpaid pre-petition payments, as defaults; a trustee may not later thwart the effect of the statute by challenging the validity of these transfers as preferences.").  As in *LCO*, if the court assumed a hypothetical trustee would have rejected the stipulation, it would be permitting a preference action that would undermine an independent statutory provision—section 1110.

In sum, *LCO* does not bar us in this case from assuming in a hypothetical liquidation that the hypothetical trustee would sue to recover the $526,402.05 deposit.  Unlike in *LCO*, permitting such an action would not violate any other

statutory provision, and it is consistent with the text and legislative history recited above.[6]  Having established that section 547(b)(5) does not forbid courts from entertaining hypothetical preference actions, we next must determine if the deposit in this case would meet the definition of an avoidable preference.

---

[6] Additionally, though BOTW is correct that we are permitting the hypothetical trustee to do something the actual trustee did not do, the actual trustee had no incentive to challenge the deposit when the bankruptcy was filed.  BOTW turned over the $564,276.83 in Tenderloin's accounts on November 12, 2012.  The trustee then brought this action in the bankruptcy court roughly one month later.  These facts are significant because the voluntary turnover to the trustee of the property subject to a creditor's right of setoff generally precludes any subsequent claim of setoff by the creditor.  *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 20 (1995) (noting that requiring a creditor immediately to turnover funds on account "would divest the creditor of the very thing that supports the right of setoff"); *In re Mauch Chunk Brewing Co.*, 131 F.2d 48, 49 (3d Cir. 1942) (finding that when trustee withdrew funds from account with bank's knowledge of bankruptcy filing, bank's acquiescence was "tantamount to renunciation of its privilege of setoff").  If BOTW loses this preference action, it might be able revive its right of setoff given "court[s] may remedy the effect of an inadvertent, involuntary or improper dissipation of the creditor's interest."  COLLIER ¶ 553.07; *see also In re Archer*, 34 B.R. 28, 31 (Bankr. N.D. Tex. 1983) (finding where bank had mistakenly turned over property it did not intentionally waive its right of setoff).  Still, even allowing for that possibility, it would not be reasonable to assume the trustee had an incentive to challenge the deposit from the outset of this proceeding.  BOTW had turned over the funds that supported the right of setoff, so there was little reason for the trustee to fear BOTW would later assert such a right if the preference action was successful and the bank disgorged the debt payment.

## II. In the Hypothetical Liquidation, the Trustee Would Avoid the Deposit as a Preference.

Schoenmann concedes BOTW would have a right of setoff in the hypothetical liquidation.[7]  BOTW asserts it would exercise that right sometime after the bankruptcy petition was filed.  In that scenario, if we permit the hypothetical preference action, BOTW will have received

---

[7] "The right of setoff  (also called 'offset') allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding the absurdity of making A pay B when B owes A." *Newbery Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d 1392, 1398 (9th Cir. 1996) (quotation marks omitted).  There is no federal right of setoff, but "11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy." *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18 (1995).  California law recognizes a bank's right to setoff against a depositor's account.  *Kruger v. Wells Fargo Bank*, 11 Cal. 3d 352, 357–58 (1974).  Accordingly, BOTW's right of setoff is preserved in the hypothetical liquidation if it meets the requirements of section 553.  Three conditions must be shown: "(1) the debtor owes the creditor a prepetition debt; (2) the creditor owes the debtor a prepetition debt; and (3) the debts are mutual." *United States v. Carey (In re Wade Cook Fin. Corp.)*, 375 B.R. 580, 594 (B.A.P. 9th Cir. 2007).  In a hypothetical liquidation as of the petition date, these requirements are met.  Tenderloin, the debtor, would owe BOTW, the creditor, a prepetition debt because the alleged preferential transfer would not have taken place, meaning the loan balance ($190,595.50) would be outstanding.  BOTW would owe Tenderloin a prepetition debt arising from the deposit of the property sale proceeds. *See Strumpf*, 516 U.S. at 21 (explaining banks obtain title to deposited funds subject to a promise to pay the depositor); *Bank of Marin v. England*, 385 U.S. 99, 101 (1966) ("The relationship of bank and depositor is that of debtor and creditor, founded upon contract.").  Finally, the debts are mutual because they involve obligations owed between the same parties.

more as a result of the debt payment than it would have received in a hypothetical chapter 7 liquidation.[8]

## Hypothetical Post-Petition Setoff

"Where a creditor fails to exercise its right of setoff prior to the filing of the petition it does not lose the right, but must proceed in the bankruptcy court by means of a complaint to lift the automatic stay so as to be allowed to exercise its already existing right to offset." *Durham v. SMI Indus. Corp.*, 882 F.2d 881, 884 (4th Cir. 1989) (internal quotation marks omitted). In accordance with that procedure, in the post-petition scenario BOTW would move to lift the stay, submit a proof of claim, and then argue its right of setoff entitles it to receive $190,595.50. "Mandatory claim disallowance under § 502(d)," however, "is one Bankruptcy Code provision that applies in chapter 7 liquidations." *In re Sierra-Cal*, 210 B.R. at 173. "It requires that the court disallow 'any claim' of any entity from which property is

---

[8] The result would not be different even if BOTW were to argue that it would exercise its hypothetical setoff right prior to the filing of the petition. Prepetition setoffs are generally challenged in three ways, only one of which would apply here. Section 553(b) provides that if a creditor exercises a setoff within ninety days of the bankruptcy, the trustee may recover the amount by which the creditor improved its position between the ninetieth day before the filing and the date of the bankruptcy. *See* 11 U.S.C. § 553(b). Ninety days before filing, Tenderloin's accounts contained approximately $173,015.00. We also must assume that BOTW would elect to setoff the full $190,595.50. BOTW would thus improve its position by $17,580.50 under this scenario. The trustee would be able to recover that amount from BOTW. At bottom, if BOTW exercised its hypothetical setoff right prior to the filing of the petition, it still received more in reality than it would in the hypothetical liquidation because it actually received $190,595.50, but would receive only $173,015.00 in the hypothetical.

recoverable by a trustee, or that is the transferee of an avoidable transfer, unless and until the property is turned over and the transfer is paid."[9]  *Id.*  Pursuant to this provision, the bankruptcy court likely would decide the trustee's hypothetical preference action before allowing BOTW's claim.  It therefore would consider whether the deposit satisfies the elements of section 547(b).

## The Section 547(b) Elements.

As previously noted, section 547(b) requires that the "transfer" be (1) to or for the benefit of a creditor, (2) for or on account of an antecedent debt, (3) made while the debtor was insolvent, (4) made within 90 days of the bankruptcy, and (5) one which permits the creditor to receive more than it would in a hypothetical liquidation where the challenged payment had not been made.  11 U.S.C. § 547(b)(1)–(5).  BOTW argues that in the hypothetical preference action it would no longer be a "creditor," the deposit would not be "for or on account of an antecedent debt," and the deposit would not constitute a "transfer."[10]  We disagree.

In the hypothetical liquidation where the debt payment had not been made, BOTW would still be a creditor because it would be owed the $190,595.50 it loaned to Tenderloin.

---

[9] "The § 502(d) disallowance is in the nature of an affirmative defense to a proof of claim and does not provide independent authority for affirmative relief against the creditor."  *In re Sierra-Cal*, 210 B.R. at 173.

[10] BOTW does not dispute the other section 547(b) elements, and they appear to be satisfied.  The deposit was made on June 13, 2012, so it occurred within ninety days of the filing of the petition.  11 U.S.C. § 547(b)(4)(A).  In the absence of the deposit, BOTW would not have been able to setoff the full $190,595.50, so the trustee could satisfy the "greater amount test."  *Id.* § 547(b)(5).

Though it is a closer question, the deposit also would be "for or on account of an antecedent debt." True, Tenderloin transferred the $526,402.05 in proceeds having already satisfied its preexisting debt, but the 1978 revision to the bankruptcy statute defined preferences "solely with respect to a payment's effect on the size of the debtor's estate." *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir. 1986); *see also* Vern Countryman, *The Concept of a Voidable Preference in Bankruptcy*, 38 Vand. L. Rev. 713, 748 (1985) ("The function of the preference concept is to avoid prebankruptcy transfers that distort the bankruptcy policy of distribution. Transfers that do distort this policy do so without regard to the state of mind of either the debtor or the preferred creditor.").[11] By that measure, in the hypothetical liquidation, the deposit would have the effect of diminishing the funds available to Tenderloin's creditors because it would increase the size of BOTW's secured claim against the bankruptcy estate. The deposit would also constitute a "transfer" under the terms of the Bankruptcy Code. It would subject the funds to BOTW's security interest, give BOTW title to the funds, and deplete the assets available for distribution to Tenderloin's creditors. Tenderloin therefore would be "disposing of or parting with . . . an interest in property." 11 U.S.C. § 101(54)(D); *see also Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1282 (9th Cir. 1996) (finding that "depositing money into a bank

---

[11] Notably, a debtor's subjective intent may be relevant in determining the applicability of an affirmative defense. *See, e.g.*, 11 U.S.C. § 547(c)(2) (providing there is no preference where a payment was made according to ordinary business terms); *In re Craig Oil Co.*, 785 F.2d at 1566 ("[A] creditor's state of mind is now immaterial in finding a preference. . . . It does not follow from the above that a *debtor's* state of mind or motivation is likewise immaterial in applying the preference *exception* of § 547(c)(2).").

account is a transfer" and correspondingly concluding that withdrawing money from a bank account is a transfer).

Arguing to the contrary, BOTW invokes *New York County National Bank v. Massey*, 192 U.S. 138 (1904). There, the Supreme Court observed that

> a deposit of money to one's credit in a bank does not operate to diminish the estate of the depositor, for when he parts with the money he creates at the same time, on the part of the bank, an obligation to pay the amount of the deposit as soon as the depositor may see fit to draw a check against it. *It is not a transfer of property* as a payment, pledge, mortgage, gift or security.

*Id.* at 147 (emphasis added). For several reasons, we are not persuaded by BOTW's invocation of *Massey*. As previously noted, "[i]n 1978, Congress fundamentally restructured bankruptcy law by passing the new Bankruptcy Code." *Begier v. Internal Revenue Service*, 496 U.S. 53, 63 (1990). Among other changes, Congress elected to expand the Code's definition of the term "transfer."[12] S. Rep. No. 95-

---

[12] In 1904, a transfer was defined "to include the sale and every other and different method of disposing of or parting with property, or the possession of property, absolutely or conditionally, as a payment, pledge, mortgage, gift, or security." *Massey*, 192 U.S. at 146; *see also* The Bankruptcy Act of 1898 § 1, Ch. 541, 30 Stat. 544, 545 (1898). Today, the parting may be with a mere "interest in property" and need not be done "as a payment, pledge, mortgage, gift, or security." *See* 11 U.S.C. § 101(54); *Smiley v. First Nat'l Bank of Belleville (Matter of Smiley)*, 864 F.2d 562, 565 (7th Cir. 1989) ("[W]e find that the narrow definition of 'transfer' . . . can no longer be the law since the Bankruptcy Reform Act took effect.").

989 at 27; *accord* H.R. Rep. No. 95-595 at 314. Pursuant to the revision, "any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title, because possession, custody, and control are interests in property." *Id.* Applying that definition, the committee reports state squarely that "[a] deposit in a bank account or similar account is a transfer." *Id.* The *Massey* court had no occasion to contemplate these amendments; it considered only the Bankruptcy Code's former and narrower definition of "transfer."

We, however, had occasion to consider the revised definition of "transfer" in *Bernard v. Sheaffer*, 96 F.3d at 1282. There, the debtors withdrew money from an account and placed it in a safe. *Id.* at 1281. They argued that withdrawals did not constitute transfers because the assets "merely changed form." *Id.* at 1282. We held that the debtors' argument "fail[ed] to take proper account of the Bankruptcy Code's definition of 'transfer,' which is *extremely* broad." *Id.* (emphasis in original). Recognizing that title passes to the bank when funds are deposited, we said the debtors owned only "claims against their bank." *Id.* at 1283. "When they withdrew from their accounts," however, "they exchanged debt for money" and thus "parted with property, satisfying the Code's definition of transfer." *Id.* "Under the holding in *Bernard*, there is no ambiguity around the definition of a transfer; withdrawals and deposits into bank accounts clearly qualify." *A & H Ins., Inc. v. Huff (In re Huff),* No. 12–05001–BTB, 2014 WL 904537, at *6 (9th Cir. B.A.P. Mar. 10, 2014). As is the case here, a deposit "exchange[s] money for debt . . . result[ing] in a 'parting with' property under the holding in *Bernard* as a matter of law." *Id.*; *see also Batlan v. Bledsoe (In re Bledsoe)*, 569 F.3d 1106, 1113 (9th Cir. 2009) (invoking

*Bernard*'s interpretation of "transfer" in the context of another section of the Bankruptcy Code).**[13]**

Next, even though "[a] debtor's bank deposit ordinarily constitutes a transfer of the debtor's property to the title and possession of the bank," some courts nonetheless have asked "whether this 'transfer' is of a *kind* [that] section 547 invalidates." Collier ¶ 547.03[1][b] (emphasis added) (citing *New Jersey Nat'l Bank v. Gutterman (In re Applied Logic Corp.)*, 576 F.2d 952 (2d Cir. 1978); *Katz v. First Nat'l Bank of Glen Head*, 568 F.2d 964 (2d Cir. 1977)). Though we doubt such an inquiry is warranted when deciding whether a transaction *constitutes* a transfer,**[14]** even assuming it is, the asserted standard is met here.

---

**[13]** *Massey* is also factually distinguishable. Here, unlike in *Massey*, the accounts were pledged as security on an antecedent loan, and the deposit itself would render BOTW fully secure. *Cf. Smith*, 265 F.3d at 964 ("[P]ayments that change the status of a creditor from partially unsecured to fully secured at the time of petition may be preferential."); *Porter v. Yukon Nat'l Bank*, 866 F.2d 355, 359 (10th Cir. 1989) (finding transfer preferential where "the effect of the transfer was to change the status of the Bank from that of a partially unsecured creditor to that of a fully secured creditor"). It is also worth noting that the Supreme Court instructs us to look to the "actual effect" of the deposit in bankruptcy, *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 229 (1936), and as explained further below, the deposit would deplete the estate's assets. The concurrence is simply incorrect in stating that the deposit "made no difference to the bank's security position." BOTW's security interest only attached because the deposited funds were transferred out of escrow.

**[14]** Both of the cited decisions were decided prior to the 1978 amendments to the Bankruptcy Code. In addition, the "diminution of estate" doctrine is used "to determine whether property that is transferred belongs to the debtor," not whether a transaction constitutes a transfer. *See Adams v. Anderson (In re Superior Stamp & Coin Co.)*, 223 F.3d

The pertinent question is whether the deposit depletes the assets of the estate available for distribution to creditors. *See Begier*, 496 U.S. at 58 (stating that the preference provision is designed to "preserve the property includable within the bankruptcy estate").[15] On the specific facts of this case, as noted before, the deposit would have that effect. No bankruptcy creditor had an interest as far as we are aware in Tenderloin's real property. Moreover, if the deposited funds had not been transferred—and therefore remained in escrow—they would have passed to the estate and thus to other creditors. Through the deposit, however, one creditor—BOTW—gained a beneficial interest in the funds. BOTW also became indebted to Tenderloin for $564,115.92, and correspondingly increased its right to exercise a setoff for the full amount of its loan. The deposit therefore represents the kind of pre-petition "transfer" that the preference provisions target. *See, e.g.*, *Meoli v. The Huntington Nat'l Bank (In re Teleservices Grp., Inc.)*, 469 B.R. 713, 744–47 (W.D. Mich. 2012) (stating that "*Massey* has become an anachronism" and finding that a deposit in a

1004, 1007 (9th Cir. 2000). To the extent that BOTW insists the deposit was not a transfer "of an interest of the debtor in property," *see id.*, that argument has been waived, *Officers for Justice v. Civil Serv. Comm'n*, 979 F.2d 721, 726 (9th Cir. 1982). Finally, the concurrence concedes that the deposit is a "transfer," but insists it is not the right *kind* of transfer because *Massey* allegedly controls when determining "what makes a preference." We are convinced that satisfying the elements of § 547(b) "makes" a transfer "a preference," and the concurrence does not disagree that those elements would be satisfied here.

[15] The key aspect of this investigation is *not* whether the exercise of a setoff right depletes the estate's assets, *see* Concurrence at 3, as that necessarily is true in every case. The question is whether the *deposit* depletes the estate's assets because deposits do not always afford the bank a right of setoff, nor are deposit accounts always pledged as security for a loan.

bank account pledged as collateral for a loan fits the definition of an avoidable transfer); *Ivey v. First Citizens Bank & Trust Co.*, 539 B.R. 77, 87 n.14 (M.D.N.C. 2015) (noting that in *Teleservices* "a part of the transfers were deposits into bank accounts that themselves served as security for the line of credit that the defendant bank extended to debtor. Therefore, whether or not the bank actually exercised its rights against the accounts, the deposits themselves created an actual or potential diminution of the estate by subjecting the funds to the bank's power under this credit agreement" (citation omitted)).

The implication of the above is that if BOTW sought to exercise its right of setoff after the petition was filed, the hypothetical preference challenge to the deposit would still be successful. As a consequence, Tenderloin's account functionally would contain $37,713.87 on the petition date, a sum far less than the $190,595.50 BOTW received, even allowing for its right of setoff.[16] Under the hypothetical

---

[16] We decline to adopt the post-petition setoff analysis suggested by the concurrence. First, though there is no question that setoffs are governed by section 553, the trustee has never argued that it would challenge a hypothetical post-petition setoff. Instead, Schoenmann asserts only that the hypothetical trustee would challenge the *deposit* as an avoidable preference. Next, while the *exercise* of a setoff results in a permissible preference because it does not constitute a transfer under the Bankruptcy Code, COLLIER ¶ 553.09[1][a], here we have a pre-petition *transfer* that renders a creditor fully secure, and thus it is not immune from preference liability. *See supra* at 27 n.13. Lastly, though the concurrence applies section 553(b) to a hypothetical *post*-petition setoff, the plain language of the statute indicates that section 553(b) applies only to *pre*-petition setoffs. *See* 11 U.S.C. § 553(b)(1) (stating that "if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor *on or within 90 days before the date of the filing of the petition*, then the trustee may recover from such a creditor the amount so offset" subject to certain conditions (emphasis added)); *see also* Collier ¶

facts, the trustee could demonstrate that the elements of section 547(b)(5) would be met.**[17]**

## CONCLUSION

We hold that courts may entertain hypothetical preference actions within section 547(b)(5)'s hypothetical liquidation when such an inquiry is factually warranted, supported by appropriate evidence, and so long as the hypothetical preference action would not result in a direct conflict with another section of the Bankruptcy Code.

Here, the undisputed facts demonstrate that BOTW received two transfers simultaneously within ninety days of Tenderloin's bankruptcy. We are also satisfied that in a hypothetical liquidation where the debt payment had not been made, the hypothetical bankruptcy trustee would challenge as preferential the $526,402.05 deposit, as would any reasonable bankruptcy trustee. Once we permit such a hypothetical preference action, Schoenmann can demonstrate that BOTW received more as a result of the debt payment than it would in a hypothetical chapter 7 liquidation. As a consequence, the trustee can prove each

---

553.09[2][c] ("The better result is to limit section 553(b) to setoffs actually taken prepetition. In addition to remaining true to the language of the text, that result is consistent with the underlying purpose of section 553, which it to encourage creditors *not* to take setoffs by generally preserving their setoff rights.").

**[17]** BOTW mentions in passing one hypothetical affirmative defense—that the bank "would not be liable pursuant to 11 U.S.C. § 550." Since BOTW does not develop the argument, however, we decline to reach it. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 499 (9th Cir. 2010); *Int'l Healthcare Mgmt. v. Hawaii Coalition for Health*, 332 F.3d 600, 609 (9th Cir. 2003).

required element of his claim, and BOTW has not shown it is entitled to judgment as a matter of law.

We REVERSE the district court's judgment in favor of BOTW. BOTW's summary judgment motion is therefore DENIED, and the matter is REMANDED to the district court with directions to remand the matter to the bankruptcy court for further proceedings consistent with this opinion. Appellee shall bear costs on appeal. Fed. R. App. P. 39(a)(3).

**REVERSED** and **REMANDED**.

KORMAN, District Judge, concurring in part and concurring in the judgment:

I concur in the decision to reverse and remand to the bankruptcy court, and join all but Part II of the majority opinion. I agree that, under the circumstances of this case, applying 11 U.S.C. § 547(b)(5)'s "greater amount" test requires us to construct a hypothetical liquidation, and that in so doing, we may consider whether a reasonable trustee would bring and win a preference action within the hypothetical Chapter 7 proceedings. I cannot, however, join in the liquidation that the majority constructs in this case, because I cannot agree that the entirety of the $526,402.05 deposit was itself a preferential transfer subject to clawback under 11 U.S.C. § 547.

The majority is correct that *Bernard v. Sheaffer*, 96 F.3d 1279 (9th Cir. 1996), binds us to begin with the premise that a bank deposit is a "transfer" under the modern Bankruptcy

Code, *see also Maj. Op.* at 23–26.[1] But the ultimate issue is not merely whether Tenderloin's deposit was a transfer, but whether it was a *preferential* one. On the latter question, the majority's position runs headlong into Justice Brandeis's seminal opinion in *New York County National Bank v. Massey*, 192 U.S. 138, 147 (1904). The majority does not ignore *Massey*; nevertheless, its treatment of that case almost totally elides what *Massey* has to say about the central question presented here.

Instead of engaging *Massey*'s analysis of what makes a preference, the majority opinion focuses at length on whether, in light of the expanded definition of "transfer" that Congress adopted in 1978, *Massey* still means that deposits are not transfers. The trouble is that *Massey* never meant that at all. The *Massey* Court "never said that customer deposits were *not transfers*." *Meoli v. The Huntington Nat'l Bank* (*In re Teleservices Grp., Inc.*), 469 B.R. 713, 745 (Bankr. W.D. Mich. 2012) (emphasis added), *cited at Maj. Op.* at 27–28. Rather, it said that such deposits were *not preferential* within the meaning of the bankruptcy laws solely because they create a right of setoff in a creditor. *Massey*, 192 U.S. at 147 ("[A] deposit of money . . . in a bank does not *operate to diminish the estate of the depositor*." (emphasis added)).

The question is whether *Massey*'s holding, that the creation of a setoff right does not suffice to make a preference, has survived Congress's creation of the contemporary scheme governing preferences and setoff. In

---

[1] The circuits are divided on this question. *See Ivey v. First Citizens Bank & Trust Co.* (*In re Whitley*), — F.3d —, 2017 WL 416964, at *3–5 (4th Cir. 2017) (noting the split and reaffirming the Fourth Circuit's pre-1978 position that deposits into one's own bank account ordinarily are not "transfers").

that respect, the *Massey* Court faced a similar statutory landscape to the one we do now. The 1898 Act provided that an insolvent debtor's transfer was preferential only if it "enable[d] any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class." § 60(a), 30 Stat. 544, 562. Nevertheless, it expressly authorized the setoff of mutually owing debts without providing an exception applicable when a setoff would improve the bank's position. *Id*. § 68(a), 30 Stat. at 565. The Court held that the preservation of setoff indicated Congress's intent that the creation and exercise of a setoff right exist as an exception to the Act's definition of a preferential transfer. *Massey*, 192 U.S. at 147. After all, setoff (and the creation of a setoff right) always favors offsetting creditors, who "receive[] a preference in the fact that, to the extent of the set-off [right], [they are] paid in full." *Id.* As Justice Brandeis explained, to "enlarge the scope of the statute defining preferences so as to prevent set-off in cases coming within the terms of [the provision authorizing setoff]" would "defeat" Congress's choice to preserve setoff under those terms. *Id.*

In enacting the 1978 Act, or any of the numerous subsequent amendments to the Bankruptcy Code, Congress could have included the creation or exercise of a setoff right in the roster of transactions that are avoidable under § 547, but it did not. Instead, it preserved the basic feature of the 1898 Act on which *Massey* relied—the treatment of preferential transfers and setoff rights in separate provisions subject to different rules. Like § 68(a) of the 1898 Act, § 553 of the post-1978 Code is an entirely separate provision that subjects setoffs, exclusively, to different rules than those applicable to the recovery of preferences generally. *See, e.g.*, *Woodrum v. Ford Motor Credit Co.* (*In re Dillard Ford, Inc.*), 940 F.2d 1507, 1512 (11th Cir. 1991).

Because that structure is unchanged, to hold that the *creation* of a setoff right that the Code preserves under the terms of § 553 may be preferential under § 547 would, as in *Massey*, "operate to enlarge the scope of the statute defining preferences so as to prevent [*the exercise* of] set-off in cases coming within the terms of [§ 553]." As in *Massey*, a preference is still defined as a transfer that leaves the receiving creditor better off than it otherwise would have been. *See* 11 U.S.C. § 547(b)(5), *see also Maj. Op.* at 27 ("The pertinent question is whether the deposit depletes the assets of the estate available for distribution to creditors."). Setoff rights are still preserved, subject to more forgiving limitations than transfers generally. *Compare* 11 U.S.C. § 553(b) *with* § 547(b).[2] And as a matter of economic reality, the creation and exercise of those rights still advantage some creditors in a way that would—but for *Massey*'s limiting construction—meet the hornbook definition of a preference.

Concededly, *Massey* interpreted the text of a different statute than the one before us today. Nevertheless, the ultimate question in any statutory interpretation case is the intent of Congress, and the Supreme Court has instructed that "Congress is presumed to be aware of a[] . . . judicial

---

[2] Indeed, the bankruptcy judge in *Meoli v. The Huntington Nat'l Bank* (*In re Teleservices Grp., Inc.*), 469 B.R. 713 (Bankr. W.D. Mich. 2012), quoted by the majority, was discussing § 553(b)'s effect on the treatment of setoffs when it labeled *Massey* an "anachronism." *Id.* at 746, *quoted at Maj. Op.* at 27–28. Its point was not that Congress no longer intended the law governing setoffs to function as an exception to the law governing preferences generally, but that the enactment of § 553(b) had "addressed preferential setoffs," by providing special terms on which they, although not subject to § 547, could be clawed back. *Id.* at 745–46. In any case, the court in *Meoli* had no cause to consider whether the creation or exercise of a setoff right could render a transfer preferential— the transfers at issue in *Meoli* were voidable not because they were preferential, but because they were fraudulent. *See id.* at 747.

interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). There is no indication that Congress meant to disrupt *Massey*'s bedrock holding when it enacted a new bankruptcy law, but preserved the structure that formed the essential basis for the Supreme Court's analysis. In such circumstances, we should be mindful not only of Congress's intent, but of the fact that "only [the Supreme] Court may overrule one of its precedents." *See Thurston Motor Lines*, *Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983) (per curiam).

In a footnote, the majority opinion also argues that this case is distinguishable from *Massey* because "the accounts were pledged as security on an antecedent loan, and the deposit itself would render BOTW fully secure." *Maj. Op.* at 26 n.13. Certainly, the creation of a new lien would have made a preferential transfer. Nevertheless, the fact that Tenderloin took the funds out of escrow and *deposited* the money made no difference to the bank's security position. All of Tenderloin's personal property was subject to the same floating lien, including its general intangibles. Those included Tenderloin's contractual right to be paid the funds out of escrow. *See In re Merten*, 164 B.R. 641, 643 (Bankr. S.D. Cal. 1994). Tenderloin's interest in those funds would have been identically encumbered, and BOTW identically secured, if the money had stayed in escrow indefinitely, or transferred out of escrow and into a safe in Tenderloin's offices.

Because *Massey*'s reasoning applies with the same force today as it did in 1904, I cannot join in the majority's holding that the $526,402.05 deposit was a preference subject to attack under § 547. I would have the hypothetical bankruptcy court treat Tenderloin's account as containing

the full $564,115.92 as of the petition date, and proceed to apply 11 U.S.C. § 553 to determine what portion of that amount BOTW could set off against Tenderloin's $190,595.50 debt.[3]

Section 553 does not preserve setoff rights without limitation. Rather, creditors may only set off subject to the strictures imposed by § 553(b), a "miniature preference provision akin to [§ 547]." *Eckles v. Petco Inc., Interstate* (*In re Balducci Oil Co., Inc.*), 33 B.R. 847, 852 (Bankr. D. Colo. 1983). Much like § 547(b) does for transfers, § 553(b) directs us to apply an improvement-of-position test—it disallows setoff to the extent that the creditor was better secured on the date of setoff than it was on the first day it became undersecured (or 90 days before bankruptcy, if an insufficiency existed at the start of the preference period).

To be sure, there is some question whether § 553(b) applies to limit actual post-petition setoffs. *See* COLLIER ON BANKRUPTCY ¶ 553.09[2][c] (noting division of authority). But as the Fifth Circuit has noted, the safeguards of § 553(b) are unnecessary post-petition in an *actual* liquidation, where the need to proceed by application to lift the automatic stay gives the bankruptcy judge an opportunity to weigh the

---

[3] The majority opinion faults me for analyzing the permissibility of a post-petition setoff when the trustee has not raised the issue (having relied whole-hog on its argument that the deposit itself was a preference). *Maj. Op.* at 28–29 n.16. This case raises the important question of how to measure the preferential impact of commonplace bank deposits, which will often turn on the permissible extent of a hypothetical post-petition setoff. "It is important that we address the proper legal standards" for bankruptcy courts to apply in addressing the ultimate issue presented here, and we may reach questions "intimately bound up with" that issue, though not raised by the parties, in order to do so. *See Kolstad v. Am. Dental. Ass'n*, 527 U.S. 526, 540 (1999).

equities of allowing or denying the creditor's claim. *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1041 n.13 (5th Cir. 1987).

By contrast, in a *hypothetical* liquidation, there is no such gatekeeper to protect other claimants. There is of course no actual bankruptcy judge available to exercise discretion in such a case, and it would push the already somewhat strained boundaries of our hypothetical analysis too far to exercise our own discretion, sitting as a three-headed hypothetical bankruptcy judge, weighing the imaginary equities of a fantasy liquidation. The majority asserts that this adds a new variable to what is supposed to be a controlled experiment, *Maj. Op.* at 28–29 n.16, but so would exercising our own discretion—by substituting our judgment for that of the real bankruptcy judge.

We cannot construct a hypothetical bankruptcy judge to review a hypothetical application to lift the stay. So to analyze a hypothetical post-petition setoff without applying § 553(b) would allow preference defendants to "have it both ways" by avoiding both the statutory improvement-in-position test and the bankruptcy court's equitable oversight. *Braniff Airways*, 814 F.2d at 1041 n.13. Like the Fifth Circuit, I would "decline to let [BOTW] have it both ways," and hold that if it wants to defend a preference action by relying "on a pre-petition right to setoff pursuant to [§] 553, it must comply with . . . [§] 553(b)." *Id.*

The ensuing analysis is straightforward. Section 553(b) directs that an offsetting creditor cannot improve its secured position relative to where it stood on the date of the first insufficiency. At all relevant times, Tenderloin owed BOTW $190,595.50. Adopting the majority's working assumption that on the 90th day before the petition, Tenderloin's bank balance was $173,015.00, this left an insufficiency of

$17,580.50 relative to its debt. Assuming that Tenderloin's debt balance remained unchanged through the petition date, § 553(b) would allow BOTW to recover at most $173,015.00 in a hypothetical post-petition setoff. I assume that, like any diligent creditor, the bank would take as much as it could, claiming that amount in full.

Since BOTW received $190,595.50 during the 90 days before bankruptcy, but only would have received $173,015.00 in a hypothetical liquidation, the trustee has made out a prima facie case that the $17,580.50 difference is voidable as a preference. So like the majority, I would reverse the judgment below and send the case back to the bankruptcy court for further proceedings. I would further instruct the bankruptcy court to limit further proceedings to considering BOTW's affirmative defenses, and then—to the extent that those do not carry the day on remand, and after resolving any factual dispute as to the amount of Tenderloin's account balances on the relevant dates—to enter judgment for the trustee in the amount given by applying the foregoing analysis.